## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

HARLEY NEWTON and TRESSA NEWTON,

     Plaintiffs,

vs.

STATE FARM FIRE AND CASUALTY COMPANY and MARY LEE JONES,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CJ-2023-589

## **DEFENDANT MARY LEE JONES' MOTION TO DISMISS**

Timila S. Rother, OBA #14310
Paige A. Masters, OBA #31142
Amanda M. Finch, OBA #34650
**CROWE & DUNLEVY, PC**
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-7700
Facsimile: (405) 239-6651
timila.rother@crowedunlevy.com
paige.masters@crowedunlevy.com
amanda.finch@crowedunlevy.com

**ATTORNEYS FOR DEFENDANT
MARY LEE JONES**

EXHIBIT
6

This is a dispute that has nothing to do with insurance agent Mary Lee Jones ("Jones") …
except that she is an Oklahoma resident and thus destroys diversity jurisdiction. Rather, this is a
dispute between Plaintiffs, Harley Newton and Tressa Newton[1] ("Plaintiffs"), and Defendant, State
Farm Fire and Casualty Company ("State Farm"), about the scope of repairs necessary to return
Plaintiffs' home to its pre-loss condition after a covered windstorm. Because an inspection
revealed hail damage to window glazing bead and window screens and repairable wind damage to
Plaintiffs' shingles, but no hail damage to the Plaintiffs' roof attributable to the reported loss, State
Farm determined that twelve shingles, window glazing bead, and window screens—but not the
entire roof—should be replaced. State Farm also determined that interior water stains on two of
Plaintiffs' ceilings should be remedied by sealing and re-painting the affected areas.[2] Plaintiffs
disagreed with State Farm's determination and demanded a total roof replacement.  This dispute
as to the scope of repair is between Plaintiffs and State Farm and no one else. Accordingly, State
Farm is the only proper Defendant.

Nonetheless, Plaintiffs allege obscure and confusing facts and irrelevant legal argument to
sue non-diverse defendant, Mary Lee Jones, despite the fact Plaintiffs cannot possibly state a claim
against Jones. Specifically, Plaintiffs sue Jones for negligent procurement of insurance and
negligent misrepresentation/constructive fraud based on representations allegedly made at policy
inception (e.g., that Jones inspected the property, that it was in good condition, and that it met State
Farm's underwriting guidelines for issuance of a replacement cost value ["RCV"] policy) and

---

[1] Upon information and belief, Mrs. Newton passed away on September 6, 2022; however, she
was still named as a Plaintiff in the action when the lawsuit was filed six months later on February
1, 2023, and listed as a Plaintiff when the Amended Petition was filed five months later on July
19, 2023.
[2] Plaintiffs do not allege what repairs State Farm should have covered for the ceilings in their
home, instead simply implying without details that the repairs State Farm determined were
necessary to remedy the ceilings were insufficient.

policy renewal. Even if Jones made these representations, Plaintiffs cannot state a claim against Jones, as stated more fully below.

In fact, this is one of dozens of cases against State Farm, filed by the same group of attorneys and defended by the undersigned counsel, alleging that dozens of different agents made essentially identical misrepresentations and committed identical underwriting failures, based on which those Oklahoma-based agents are also sued.[3] The allegations are implausible when alleged as to one agent but are outright impossible when alleged as to all.[4] And, there are dozens more identical petitions suing State Farm and local agents being defended by different counsel. There is no reasonable explanation for the joinder of this many agents, to this many cases on parroted oral misrepresentations by each agent except that they are Oklahoma residents who destroy diversity and prevent removal.

However, the Court need not know this entire charade to decide this Motion to Dismiss. Jones cannot be liable for fraud or negligent procurement based upon the asserted theory that Plaintiffs requested a policy to restore their roof to its pre-loss condition but did not receive the requested coverage because State Farm did not agree to pay to replace their roof. The dispute, apparent even from the vague facts pled by Plaintiffs, has everything to do with the scope of repairs and nothing to do with the coverage procured. Plaintiffs had the very coverage they claim they were promised and nothing that Jones did or did not do resulted in State Farm's determination that

---

[3] Interestingly, Plaintiffs' choice of venue perpetuates the disconnect by choosing to file this case in Oklahoma County, despite the fact that Plaintiffs reside (and the property is situated) in Blaine County and that Jones is also located in Blaine County.

[4] By way of further example of the untailored, cookie-cutter nature of the Petition, while Plaintiffs refer to their policy as a "homeowners' replacement cost insurance policy," their policy is in fact a manufactured home policy (which provides ACV coverage), to which they added an Inflation and Dwelling Replacement Cost Endorsement (which provided RCV coverage). Am. Pet., at ¶ 4.

Plaintiffs' whole roof need not be replaced.[5] In short, the policy procured is not what caused the injury alleged. For these and other reasons, set forth more fully below, Plaintiffs' Amended Petition against Jones should be dismissed, pursuant to 12 O.S. § 2012(B)(6).

## THE ALLEGATIONS IN PLAINTIFFS' AMENDED PETITION

Plaintiffs' Amended Petition is nearly identical to the dozens of others their counsel have filed against State Farm and State Farm agents. Like all the others, this petition begins by alleging "Plaintiffs entered into a contract of insurance with State Farm to provide replacement cost coverage" for the at-issue property. Am. Pet., ¶ 4. "At the time Plaintiffs purchased the Policy from Defendants, Jones was an agent and/or ostensible agent of State Farm." *Id.* Plaintiffs contend they "requested Jones obtain a replacement cost policy that would provide coverage for Plaintiffs' Insured Property in the event of a loss (i.e., replacement coverage)," and that they "specifically requested a policy that would fully replace Plaintiffs' roof in the event of a loss." *Id.* at ¶ 6.

Plaintiffs assert that State Farm requires "agents to conduct an inspection of the Insured Property before State Farm will issue replacement cost coverage and … periodic inspections thereafter." *Id.* at ¶ 7. Plaintiffs maintain that this inspection was, in part, to "verify the roof's condition to ensure it satisfied State Farm's underwriting guidelines." *Id.* They also allege "the roof's age, condition, and predominate surface materials were all factors that dictated the calculation of the increased premium associated with this type of coverage and affected Plaintiffs' eligibility to obtain replacement cost coverage for Plaintiffs' roof." *Id.* at ¶ 8. To determine the roof's eligibility for insurance, Plaintiffs contend, "[a]n inspection by Jones would have been necessary and required," for "[i]n the event the roof was ineligible for the requested replacement

---

[5] *If* Plaintiffs had requested a policy that covered hail and State Farm had denied the claim because hail is not a covered peril, that would have been a dispute about whether the agent procured the correct coverage under a policy.

cost coverage … Jones had an independent duty to report the same to Plaintiffs and State Farm." *Id.*

Plaintiffs allege that "[n]either Jones nor State Farm advised Plaintiffs at any time that Plaintiffs' roof was ineligible for the requested replacement cost coverage due to it being too old, worn, in poor condition, plagued by pre-existing damage/issues, or any other reason." *Id.* at ¶ 9. Rather, Plaintiffs assert Jones "specifically advised and represented to Plaintiffs that the roof was in good condition, satisfied all of State Farm's guidelines and underwriting requirements (i.e. its age, physical condition, etc.), and therefore qualified and was eligible for full replacement cost coverage (versus ACV)—the best policy State Farm offered." *Id.* at ¶ 10. Accordingly, "Jones then procured, and State Farm issued, a homeowners' full replacement cost insurance policy, Policy No. 36-EL-8429-8 (the "Policy"), covering Plaintiffs' Insured Property (including the roof)." *Id.* at ¶ 11.

Next, Plaintiffs allege that Jones, "[i]n procuring the Policy for Plaintiffs … independently established, calculated, and set the Policy's replacement cost limits" and "recommended and represented to Plaintiffs that they should ensure Plaintiffs' Insured Property to 100% of its replacement cost value, as determined by Jones utilizing State Farm's valuation software and information from Jones's purported inspection." *Id.* at ¶¶ 12-13. Plaintiffs go so far as to claim they had "no input regarding the amount of coverage Jones independently selected and calculated." *Id.* at ¶ 13. Thus ends the substantive factual allegations against Jones.

The Amended Petition then turns to the real reason Plaintiffs bring this action—State Farm's partial denial of their claim. They allege that "[u]pon discovery of wind/hail damage to their roof, Plaintiffs contacted a local contractor to assess and inspect the damage." *Id.* at ¶ 19. Plaintiffs allege that upon being told by the contractor that their roof had been totaled by hail and

the estimated full repairs of the wind and hail damage would cost $11,057.38, they filed a claim with State Farm. *Id.* They further allege that on September 9, 2021, State Farm (through its adjusters) "confirmed Plaintiffs' roof was indeed totaled and had cause (sic) interior water damage from [the] leak, but inexplicably limited replacement to just a handful of shingles and some paint to the interior . . . ." *Id.* at ¶ 20. Plaintiffs assert State Farm "concluded the damage occurred on March 16, 2021" and "provided a lowball payment to Plaintiffs in the amount of $115.26." *Id.*

Like those before them, Plaintiffs contend this partial denial of their claim was "predicated upon a systematic, state-wide Scheme designed to increase denials and/or decrease payments on valid roof claims." *Id.* at ¶ 21. Plaintiffs assert that this Scheme consists of State Farm (a) "underscop[ing] and undervalu[ing] damages by attributing much of the damage to non-covered, pre-existing issues," (b) "ignoring hail damage that does not penetrate the shingle mat," (c) "attributing much of the damage to non-covered, pre-existing issues," (d) "'spot repairing' damaged shingles on an unrepairable roof," (e) "estimating repairs that are inconsistent with the roofing system's requirements and applicable building codes," (f) "prevent[ing] policyholders from exercising their full rights . . . by inappropriately back-dating the date of loss" and (g) utilizing "estimating software" that is inaccurate, inconsistent, and "reduce[s] the amount paid on any claim." *Id.*

Plaintiffs do not, however, provide any facts to support their bald allegation that State Farm "attribute[ed] much of the damage to non-covered, pre-existing issues," alleging instead that Plaintiffs' claim was underpaid because State Farm "contend[ed] the remaining roof damage was not from hail" (which is true). *Id.* at ¶ 20. Nonetheless, they include yet another allegation borrowed in substance from petitions filed by their counsel in other cases, that "State Farm is prohibited from denying a claim due to non-covered causes or pre-existing damage unless State

Farm can substantiate those denial grounds with an inspection *that predates the inception of coverage and/or reinspection every five years thereafter*." *Id.* at ¶ 22. "Without a prior inspection," Plaintiffs urge, "State Farm's denial based on pre-existing damage constitutes bad faith." *Id.*

Plaintiffs sue State Farm for breach of contract and the duty of good faith and fair dealing on grounds it failed to provide coverage to pay Plaintiffs all benefits to which they were entitled by refusing to cover hail damage that does not penetrate the shingle mat, along with a long list of other generic misconduct, including a failure to perform a fair investigation, use of knowingly inaccurate valuation software to calculate replacement cost of Plaintiffs' property, use of inaccurate claim estimating software and unit pricing, and lack of "compliance with [State Farm's] own underwriting guidelines, policies, and procedures in denying coverage to Plaintiffs on the basis of pre-existing damage." *Id.* at ¶¶ 27-36. They allege that "[a]s a consequence of State Farm's breach of the duty of good faith and fair dealing, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, and physical and emotional suffering that naturally results from an insurance failure" in an amount in excess of $75,000. *Id.* at ¶ 37.

Plaintiffs then turn to their "legal" theories against Jones, asserting a claim of "negligent procurement of insurance" based on allegations Jones failed to "procure and renew an all-risk replacement cost policy that provided coverage for all fortuitous losses and weather-related damage" among a laundry list of other alleged failures. *Id.* at ¶ 43. They allege Jones was required to "inspect Plaintiffs' Insured Property (including the roof) and independently verify its condition prior to the Policy's inception" so she could determine whether the property "was acceptable to State Farm, consistent with its internal underwriting guidelines." *Id.* at ¶ 42. They claim that "Jones

was negligent and/or breached the duties owed to Plaintiffs" by engaging in fifteen standard acts and omissions their counsel have asserted, in large part, against multiple other agents, including failing to comply with State Farm underwriting guidelines, procuring a Policy that does not accurately reflect the replacement cost of Plaintiffs' property, "[f]ailing to procure and renew an all-risk replacement cost policy that provided coverage for all fortuitous losses and any weather-related damage", and "[p]rocuring and renewing illusory coverage purportedly providing full replacement coverage on Plaintiffs' Insured Property (including the roof)." *Id.* at ¶¶ 43(a)-(e). They then assert the exact same damages against Jones for negligent procurement as they did against State Farm for bad faith. *Compare id.* at ¶ 47, *with id.* at ¶ 37.

Plaintiffs also assert a constructive fraud and negligent misrepresentation claim against Jones based on the same allegations. *Id.* at ¶¶ 49-60. They contend "Jones had a duty to exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiffs of the nature and character of the insurance procured," and Jones breached this duty by making 20 misrepresentations (largely copied and pasted from Petitions filed against other agents), including statements that Plaintiffs' roof met State Farm's underwriting guidelines; the property was in good condition and eligible for "the comprehensive full replacement coverage (rather than ACV)," "the replacement cost valuation [Jones calculated] was accurate and commensurate with current market and reconstruction costs in an amount necessary for Plaintiffs to replace and/or rebuild Plaintiffs' Insured Property back to its pre-loss condition in the event of a loss," and that the Policy "fully covered weather-related damage (even cosmetic, whether big or small)" and covered "all fortuitous losses," "all forms of hail damage," and "all forms of wind damage." *Id.* at ¶ 53.[6] And yet again,

---

[6] Plaintiffs' counsels' numerous cut-and-paste errors, such as the use of inconsistent pronouns when referring to Jones, is yet another example of their cookie-cutter approach to each of these cases—irrespective of the individual facts.

they assert they suffered the same damages as a result of Jones' misrepresentations that they suffered due to State Farm's bad faith. *Compare id.* at ¶ 59, *with id.* at ¶ 37.

## ARGUMENT AND AUTHORITIES

### I. PLAINTIFFS CANNOT STATE A CLAIM FOR NEGLIGENT PROCUREMENT.

Plaintiffs' allegations against Jones, when amalgamated, plead only that (1) Plaintiffs asked Jones to procure and renew a full RCV policy; (2) Jones represented Plaintiffs' Property and roof were in good condition and eligible for RCV coverage; (3) Jones represented she could "procure coverage that would fully restore the Insured Property and roof to its pre-loss condition in the event of damage and/or loss"; (4) Jones procured and State Farm issued a RCV policy; (5) Jones breached duties owed to Plaintiffs because the policy procured did not "realistically provide the coverage promised, given the exceedingly narrow and rare circumstances in which hail damage is covered" and did not "fully restore Plaintiffs' Insured Property back to its pre-loss condition"; and (6) "[a]s a result of Defendants' conduct, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs." Am. Pet., ¶¶ 40-60. These "copycat" facts are largely irrelevant and entirely untrue. However, even if taken as true, Plaintiffs cannot possibly state a claim against Jones with these facts—much less the truth.

Oklahoma law recognizes a cause of action for negligent procurement against an insurance agent under certain circumstances. *See Swickey v. Silvey Cos.*, 1999 OK CIV APP 48, ¶ 8, 979 P.2d 266, 268. "An agent has the duty to act in good faith and use reasonable care, skill and diligence in the procurement of insurance." 1999 OK CIV APP 48, ¶ 13, 979 P.2d at 269. Only if "*by the agent's fault*, insurance is not procured as promised *and the insured suffers a loss*" as a result can an agent be liable in tort for breaching this duty of care. *Id.* (emphasis added). To prevail on a claim for negligent procurement, "'a plaintiff must show that the insurance agent agreed to procure insurance coverage effective as of a certain date and time, or of a certain breadth, and then

failed to do so.'" *Pardue v. Humble Ins. Agency*, No. CIV-14-1049-D, 2016 WL 4275816, at *2

(W.D. Okla. Aug. 12, 2016) (quoting *Hardison v. Balboa Ins. Co.*, 4 F. App'x 663, 673 (10th Cir.

2001)). Here, Plaintiffs cannot possibly state a claim for negligent procurement because (a) the

coverage requested was procured, (b) the policy type/coverage did not cause Plaintiffs' alleged

injury, and (c) the agent owes no underwriting duty to the insured.

### A. Jones Procured a Policy that Covered Wind and Hail and Provided RCV Coverage.

Plaintiffs' claim for negligent procurement is facially inexplicable. They allege they asked

for a full replacement cost insurance policy (Am. Pet., ¶ 6) and then admit, as they must, that "State

Farm issued[] a homeowner's *full replacement cost insurance policy*, Policy No. 36-EL-8429-8."

Am. Pet., ¶ 11 (emphasis added). Indeed, there is no doubt that Plaintiffs had replacement cost

coverage.[7]

"Replacement cost insurance provides greater coverage than an actual cash value policy

and 'is designed to cover the difference between what property is actually worth and what it would

cost to rebuild or repair that property.'" *Graves v. Am. Fam. Mut. Ins. Co.*, 686 F. App'x 536, 538

(10th Cir. 2017) (citation omitted). "Under a replacement cost policy, the insured must actually

repair or replace the damaged property in order to recover the full replacement cost; otherwise, the

insured may recover only the actual cash value.... The reason for this requirement 'is to prevent

---

[7] Plaintiffs submitted a claim for wind and hail damage in 2011. The adjuster found hail damage
on one shingle on the north slope, as well as gutters, downspouts, skirting, fence, and shed roof
and prepared an estimate in the amount of $3,031.67 to remove and replace the front north gutters
and downspouts, a shingle, west elevation skirting, part of the fence, south slope of the shed roof,
and trim on the shed door. After accounting for the $1000 deductible and depreciation, $1,943.23
was paid to Plaintiffs. Ten years later, that damage had not been repaired. Therefore, Plaintiffs
would have been on notice in 2011 as to what their Policy covered, and thus, their claims for
negligent procurement or misrepresentation asserted in 2023 based on the actions of the agent in
selling the policy would be long ago barred by the two-year statute of limitations for torts. 12 O.S.
§ 95(3).

an insured from directly profiting through the receipt of cash funds beyond the actual cash value of the loss'." *Id.* (citation and internal quotations omitted). *See also Frontline Fellowship, Inc. v. Bhd. Mut. Ins. Co.*, No. CIV-21-357-PRW, 2022 WL 16856111, at *3-4 (W.D. Okla. Nov. 10, 2022).

In addition to Plaintiffs' concession that Jones procured them a "full replacement cost insurance policy," the FE-7528.3 Inflation and Dwelling Replacement Cost Endorsement to Plaintiffs' Policy provides that "until actual repair or replacement is completed, [State Farm] will pay only the actual cash value of the damaged part of the property, up to the applicable limit of liability shown in the **Declarations**, not to exceed the cost to repair or replace the damaged part of the property." FE-7528.3 Inflation and Dwelling Replacement Cost Endorsement, Ex. 3 hereto ("RCV Endorsement"); Renewal Certificate at 1, Ex. 1 hereto (listing FE-7528.3 as purchased endorsement). "[W]hen the repair or replacement is actually completed, [State Farm] will pay the covered additional amount [Plaintiffs] actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the **Declarations**, whichever is less."[8] "RCV Endorsement, Ex. 3. That is precisely what a replacement cost coverage policy entails. *Graves*, 686 F. App'x at 538. Therefore, the fact that Plaintiffs received exactly the coverage they requested, as shown by the face of the Policy and as conceded in their Amended Petition, is grounds for dismissal under § 2012(B)(6). *See Pardue*, 2016 WL 4275816 at *2; Order at 5, *Marino v. State Farm Fire & Cas. Co.*, No. 5:22-cv-00885-HE (W.D. Okla. Aug. 7, 2023), attached hereto as Ex. 4 (denying motion to remand because it was "undisputed that the policy the [plaintiffs] wanted — one for full cost replacement coverage of

---

[8] Because "[t]he interpretation of an insurance policy is a question of law," *Cherokee Nation v. Lexington Ins. Co.*, 2022 OK 71, ¶ 9, 521 P.3d 1261, 1266, State Farm provides the Court with a copy of Plaintiffs' Policy and cites the applicable provisions.

their property — was in fact delivered"); Order at 6, *Goebel v. State Farm Fire & Cas. Co.*, No. CIV-22-0882-HE (W.D. Okla. Aug. 7, 2023), attached hereto as Ex. 5 (same).

Apparently cognizant of this fatal flaw, Plaintiffs also allege the full replacement coverage was "illusory" (Am. Pet., ¶ 53(a)), without any explanation of how any conduct by Jones made it illusory. Indeed, it seems plain that "illusory" is simply another way of saying Plaintiffs disagreed with State Farm's claim decision. To the extent Plaintiffs allege they did not receive the policy requested because of the alleged "Scheme" by State Farm to "limit[] claim payments to damage caused by only the rarest and most severe hail storms, which State Farm accomplishes by ignoring hail damage that does not penetrate the shingle mat" (Am. Pet., ¶ 21), as the Court recognized in *Goebel* and *Marino*, that complaint speaks to State Farm's application of the policy language in the claims administration process, which if established, may be a basis for a claim against State Farm but "is something different from proving that the agent failed to deliver the policy promised." Order at 6, *Marino*, No. 5:22-cv-00885-HE (W.D. Okla. Aug. 7, 2023), Ex. 4; Order at 6, *Goebel*, No. CIV-22-0882-HE (W.D. Okla. Aug. 7, 2023), Ex. 5. In sum, Plaintiffs' Amended Petition, the Policy, and the law make plain that Plaintiffs received exactly what they allege they asked Jones to procure—a policy that provided full replacement cost coverage.

**B.  Plaintiffs Fail to Show that Jones' Alleged Conduct Injured Plaintiffs.**

Even if the Policy was different than requested, that is not what caused the disagreement between State Farm and Plaintiffs regarding the scope of damage to Plaintiffs' roof and thus is not what caused Plaintiffs' alleged injury. As with all negligence claims, a required element of a negligent procurement claim is *causation*. Plaintiffs must show they "suffered damages flowing from the breach of the agent's duty of care." *Castens v. Conseco Life Ins. Co.*, No. 11-CV-628-TCK-FHM, 2012 WL 610001, at *2 (N.D. Okla. Feb. 24, 2012). That is, "there must be 'some

reasonable connection between the act or omission of the defendant and the damage which the Plaintiffs ha[ve] suffered.'" *West v. Chaparral Energy, LLC*, No. CIV-16-264-F, 2018 WL 8264627, at *4 (W.D. Okla. Aug. 13, 2018) (quoting *Steed v. Bain-Holloway*, 2015 OK CIV APP 68, 356 P.3d 62, 68). Causation is entirely absent here.

The injury alleged by Plaintiffs from the conduct of the agent and of State Farm in this case is the same—failure to pay to replace Plaintiffs' roof or provide more extensive interior repairs. Am. Pet., ¶ 20. The cause of that alleged injury, according to Plaintiffs, is State Farm "limit[ing] replacement to just a handful of shingles and some paint to the interior." *Id*. Thus, the cost to repair or replace the entirety of the roof never arose. Not only does this show that the alleged absence of RCV coverage did not injure Plaintiffs, it also negates any claim the RCV coverage, under these facts, was illusory. It was instead simply immaterial. Thus, Plaintiffs' negligent procurement claim should be dismissed. *See West*, 2018 WL 8264627 at *4 (dismissing negligence claim for Plaintiffs' failure to sufficiently allege facts to establish causation).

*Gellner v. Progressive Northern Insurance Co.* is instructive on the element of causation. No. 21-CV-0401-CVE-JFJ, 2021 WL 5789146 (N.D. Okla. Dec. 7, 2021). In *Gellner* the insureds submitted a claim for property damage to their boat, claiming it collided with an object in the water. *Id*. at *1. Their insurer denied the claim finding the damage was caused by wear and tear and lack of maintenance. *Id*. The insureds sued the insurer for breach of contract and bad faith and their agent for negligent procurement. *Id*.

The insurer removed the case to federal court, arguing in part, that the plaintiffs' claims had nothing to do with the nature of the insurance policy issued and therefore plaintiffs had not stated a viable claim against the agent. *Id*. The court agreed, finding that there was "no possibility that plaintiff could recover against" the agent; the insurer did "not deny that the insurance policy

cover[ed] damage caused by collisions" and did "not dispute that plaintiffs' claim would be covered if plaintiffs could establish that damage to the boat was caused by a collision." *Id.* at *3. The court reasoned that the case was "simply a garden variety breach of insurance contract claim against the insurer, and there [were] no allegations in the Petition suggesting that the insurer's decision on plaintiffs' claim would have been different if the insurance agent had obtained some other insurance policy." *Id.* Instead, the "outcome of plaintiffs' claims against [the insurer] depend[ed] upon the cause of the damage to the boat, not the lack of collision coverage in the insurance policy," and thus, plaintiffs had not stated a viable claim against the agent. *Id.*

Here, Plaintiffs specifically allege State Farm wrongly refused to pay their claim because it "limited replacement to just a handful of shingles and some paint to the interior." Am. Pet., ¶ 20. But, like *Gellner*, State Farm does not deny that the policy covers wind and hail damage. In fact, State Farm paid to repair the portions of the property that were damaged as a result of the windstorm reported by Plaintiffs. As a result, absent from the Amended Petition is any explanation of how State Farm's claim decision would have differed if the agent had bound coverage exactly as Plaintiffs allege they requested (which the agent in fact did). Thus, there is not and cannot be any allegation that the alleged failure to procure coverage as requested injured Plaintiffs. As in *Gellner*, there is "no possibility that [P]laintiff[s] could recover against" Jones under Oklahoma law based on this theory. *Gellner*, 2021 WL 5789146 at *3.

### C. Plaintiffs Fail to Show that Jones Owed an Underwriting Duty to Plaintiffs.

Plaintiffs' Amended Petition is replete with out-of-date generalizations about an agent's inspection and/or underwriting obligations and allegations Plaintiffs were misinformed or uninformed about the outcome of underwriting inspections. *See, e.g.,* Am. Pet., ¶¶ 8-9, 12-13, 17, 41-43, 54. The allegations are based on flawed reading of State Farm's underwriting guidelines,

but it is immaterial because any inspection or underwriting duties by an agent that exist are duties owed to State Farm and not the insureds. Plaintiffs vaguely link these (non-existent) underwriting duties to the negligent procurement claim by alleging Jones breached a duty owed to them by "[f]ailing to confirm at the time of procurement and renewal whether the Insured Property (including the roof) met all underwriting guidelines, particularly with regard to the condition of the roof and pre-existing damage." *Id.* at ¶ 43 (a)(ii). This argument is indecipherable because an insurance policy issued, under which Plaintiffs sue State Farm for benefits. Therefore, the property did satisfy State Farm's underwriting requirements.

Regardless, this theory presupposes a duty to the insureds with regard to underwriting which does not exist. The courts to address the issue are in agreement that an agent owes no underwriting duty to the insured. Order at 6, *Marino*, No. CIV-22-885-HE (W.D. Okla. Aug. 7, 2023), Ex. 4 hereto ("[P]laintiff has not identified any Oklahoma case suggesting that whatever role an agent plays in the underwriting process results in a duty owed to the insured."); Order at 3, *Goebel*, No. CIV-22-882-HE (W.D. Okla. Aug. 7, 2023), Ex. 5 ("[T]here is no basis shown for concluding that [State Farm Agent] Garetson undertook or otherwise had a duty beyond securing the issuance of the initial and renewal policies for full replacement coverage."). This makes sense, as insurance companies conduct underwriting for their own benefit—to recognize and reduce risk—and not as a service to inform prospective (or existing) insureds of the condition of their house. *See Gray v. Derderian*, 464 F. Supp. 2d 105, 109 (D. R.I. 2006).[9] There is no underwriting duty which could be breached and thus Jones should be dismissed.

---

[9] Even if Plaintiffs' Policy did not have an RCV endorsement (it does) and even if the dispute was the scope of coverage instead of the scope of the loss (it isn't), Oklahoma courts have repeatedly held that an insurance agent need only offer coverage mandated by law and coverage for the needs that are disclosed by the insureds, and this duty is not expanded by a general request for full or adequate coverage. *Rotan v. Farmers Ins. Grp. of Cos.*, 2004 OK CIV APP 11, ¶ 3, 83 P.3d 894,

## II.   PLAINTIFFS CANNOT STATE A CLAIM AGAINST JONES FOR CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION.

Plaintiffs' claim for "constructive fraud and negligent misrepresentation"[10] is an effort at establishing a different legal theory on the same erroneous facts, and it fails for the same reasons and more. To state a claim for constructive fraud, a plaintiff must allege facts to show (1) defendant owed plaintiff a duty of full disclosure; (2) defendant misstated a fact or failed to disclose a fact to plaintiff; (3) defendant's misstatement or omission was material; (4) plaintiff relied on defendant's material misstatement or omission; and (5) plaintiff suffered damages as a result. *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1113 (N.D. Okla. 2003). "[T]he circumstances constituting fraud or mistake shall [also] be stated with particularity." 12 O.S. § 2009(B). To do so, a plaintiff's petition must set forth "'the *time, place, and content* of an alleged false representation.'" *Gianfillippo v. Northland Cas. Co.*, 1993 OK 125, ¶ 11, 861 P.2d 308, 311. Here, Plaintiffs' Amended Petition does not set forth facts to establish each element of their claim, let alone with the particularity required by § 2009. The claim, therefore, should be dismissed. 1993 OK 125, ¶ 13, 861 P.2d at 311 (affirming dismissal of fraud claim for failure to allege requisite elements).

In their Amended Petition, Plaintiffs allege Jones made 20 misrepresentations and/or omissions which essentially fall into three categories: (1) representations regarding Plaintiffs' eligibility for replacement cost value coverage, including those relating to the completion of

---

895; *Rivera v. Hartford Ins. Co.*, No. CIV-14-1082-HE, 2014 WL 7335320, at *2 (W.D. Okla. Dec. 19, 2014). General assertions, like Plaintiffs make here, that an agent failed to "procure the replacement cost insurance coverage Plaintiffs requested," *Rivera*, 2014 WL 7335320 at *2, or that the policy "did not serve to actually replace [Plaintiffs'] ... property when it was damaged or destroyed by a covered loss," *Country Gold, Inc. v. State Auto Prop. & Cas. Ins. Co.*, No. CIV-14-1398-D, 2015 WL 431638, at *2 (W.D. Okla. Feb. 2, 2015), do not provide a basis for a negligent procurement claim. *See Rivera*, 2014 WL 7335320 at *2; *Country Gold*, 2015 WL 431638, at *3.

[10] Negligent misrepresentation is one type of constructive fraud and requires the same elements to be met. *See, e.g, CashCall, Inc. v. BancFirst*, No. CIV-16-927-W, 2016 WL 9559037, at *5 n.10 (W.D. Okla. Dec. 15, 2016).

inspections, compliance with underwriting guidelines, and good condition of Plaintiffs' house (Am. Pet., ¶ 53(a), (b)(i)-(iii), (b)(xix)); (2) representations regarding the calculation of the replacement cost value of Plaintiffs' home using State Farm's valuation tool (*id.* at ¶ 53(b)(xiv)-(xviii)); and (3) representations regarding the coverage provided by Plaintiffs' Policy (*id.* at ¶ 53(b)(iv)-(xiii)). They say these misrepresentations were made by Jones (*id.* at ¶ 53), but they do not say when or where they were allegedly made, the context in which they were made, or even specifically what was said. In that regard, the Amended Petition falls far short of satisfying § 2009(B).

Further fatal to the claim is that none of these alleged misrepresentations *caused* the damages of which Plaintiffs complain. That is, even assuming all of these statements were spoken by Jones (they were not), the element of causation is absent. The only injury alleged by Plaintiffs for any claim is that "[a]s a result of the *Defendants'* [conduct]"—not Jones alone—"Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, and physical and emotional suffering." *Compare* Am. Pet. at ¶ 59 (constructive fraud and negligent misrepresentation) *with id.* at ¶ 37 (bad faith claim), *and id.* at ¶ 47 (negligent procurement claim). *Plaintiffs suffered no damage from the alleged misrepresentations because none of the alleged misrepresentations are the reason for the scope of damage determination in this claim.* The only "deprivation of monies" identified (or even plausible) was State Farm's refusal to pay to replace Plaintiffs' roof because it determined that Plaintiffs' roof was not damaged by hail and that the shingles that had been damaged by wind were largely repairable. That decision had nothing to do with inspections being completed, whether the roof met all "underwriting guidelines," whether Plaintiffs had RCV coverage, or how State Farm pays a claim under RCV provisions. *Cf. Smith v. Allstate Vehicle &*

*Prop. Ins. Co.*, No. CIV–14–0018–HE, 2014 WL 1382488 at *4 n.7 (W.D. Okla. April 8, 2014) ("[P]laintiffs cannot recover for alleged misrepresentations regarding coverage for a total loss when their home was not totally destroyed.").

Plaintiffs also cannot establish the existence of a "legal or equitable duty" ***on the part of Jones*** as must exist to state a claim for negligent misrepresentation/constructive fraud. The only duty actually alleged in the constructive fraud claim is the same duty alleged for negligent procurement—to "exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiffs of the nature and character of the insurance procured." Am. Pet., ¶ 52. That does not suffice. *Country Gold, Inc.*, 2015 WL 431638 at *4. The duty from which a negligent procurement theory arises, "to act in good faith and to exercise reasonable care, skill and diligence in the procurement of insurance," does not automatically establish the "legal or equitable" duty required for a constructive fraud claim. *See, e.g., Siddique v. W. Heritage Ins. Co.*, No. CIV-14-456-SPS, 2015 WL 2451734, at *3 (E.D. Okla. May 21, 2015). To the extent Plaintiffs' claim is premised on an alleged underwriting duty or duty to inspect, such legal duty does not exist, as demonstrated in § I(C), *supra*. *See, e.g., In re SandRidge Energy, Inc.*, No. CIV-13-102-W, 2013 WL 12094215, at *10 (W.D. Okla. Sept. 11, 2013) (dismissing fraud claim where "there [we]re no allegations in the Complaint that [defendants] owed the plaintiffs a duty of disclosure").

Moreover, the allegations in the Amended Petition make clear that many of the alleged statements were not misstatements at all but spoke the truth. Plaintiffs' house ***did*** satisfy underwriting and qualified for replacement cost coverage. The Policy that State Farm issued, and under which Plaintiffs sue and seek benefits, ***does*** provide RCV coverage. *See* § I(A), *supra*. *See also Smith*, 2014 WL 1382488 at *2 (rejecting claim agent misrepresented property would be replaced without any deduction for depreciation where policy provided for replacement without

depreciation if the insured repaired or replaced the property). The Policy also covers wind and hail damage. Policy, § I, p.8, Ex. 2 hereto.[11] State Farm's claim decision simply found that hail and wind did not cause damage that necessitated Plaintiffs' roof be completely replaced. Am. Pet., ¶ 20.

Moreover, Plaintiffs could not have reasonably relied upon any alleged misrepresentations about their Policy, anyhow, because they received a copy of the same. It has long been the law that insureds have a duty "to read and know the contents of the polic[y]" before they accept it and an applicant "who accepts [a policy] the provisions of which are plain, clear, and free from all ambiguity, is chargeable with knowledge of the terms and legal effect." *Liverpool & L. & G. Ins. Co. v. T.M. Richardson Lumber Co.*, 1902 OK 7, 69 P. 936, 937; *see also Country Gold*, 2015 WL 431638 at *4 (dismissing constructive fraud claim in part because there was no dispute plaintiff received policy and thus could not have reasonably relied upon any misrepresentations about it); *Siddique*, 2015 WL 2451734 at *4-5 (same). Here, not only was no duty owed, but there is no injury that can be traced to any alleged misrepresentations by Jones.

## III. PLAINTIFFS' AMENDED PETITION FAILS TO SATISFY THE MOTION TO DISMISS STANDARD.

"The purpose of a motion to dismiss is to test the legal sufficiency of the pleadings." *Patel v. OHM Med. Ctr., Inc.*, 1999 OK 33, ¶ 43, 987 P.2d 1185, 1202. To survive a motion to dismiss, a Petition must contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief," 12 O.S. § 2008(A)(1), "to give an opposing party fair notice of the claim and the grounds upon which it rests." *Ind. Nat'l Bank v. State Dep't of Human Servs.*, 1994 OK 98,

---

[11] Citation to the Policy (inclusive of Declarations/Endorsements) in support of Jones' Motion to Dismiss does not convert the Motion to one for summary judgment. The Policy is referenced in the Petition and is integral to Plaintiffs' claims. *Tucker v. Cochran Firm-Criminal Def. Birmingham L.L.C.*, 2014 OK 112, ¶ 30, 341 P.3d 673, 685.

¶ 2, 880 P.2d 371, 375.  Dismissal is proper under 12 O.S. § 2012(B)(6) where, as here, the Amended Petition fails to set forth (1) a cognizable legal theory of liability or (2) facts to support any cognizable legal theory. *Lockhart v. Loosen*, 1997 OK 103, ¶ 4, 943 P.2d 1074, 1078.

As demonstrated above, Plaintiffs cannot possibly set forth facts to support a cognizable legal theory of liability against Jones. Plaintiffs' use of a parroted Petition filed by their attorneys against State Farm and dozens of other agents without regard to the facts of each case is further proof.  Plaintiffs' counsel repeats, occasionally rearranging, the same allegations every time, against every agent, as if every case were the same and every agent a liar.

The impermissibility of this tactic was recently expressly recognized by United States District Judge Joe Heaton in a trio of orders denying Motions to Remand based upon fraudulent joinder and dismissing the agent in each case. In those cases, the Court held that the lack of "good faith basis for a substantial portion of the facts alleged and which [we]re relied on in an effort to state a claim against the resident defendant ... constitute[ed] fraud in the pleadings of jurisdictional facts." Order at 3, *Goebel*, No. CIV-22-882-HE, Ex. 5 (finding plaintiff's petition "replete with false statements," most notably the "substantially identical allegations being implausibly made against State Farm agents in dozens of other cases"); Order at 2, *Marino*, No. CIV-22-885-HE, Ex. 4 (finding plaintiff's "substantially identical, cookie-cutter allegations," "for which there [was] zero evidence" constituted "actual fraud in the pleading of ... jurisdictional facts").

Here, just as in *Goebel* and *Marino* though, Plaintiffs' counsel again allege, amongst other practically identical accusations, that Jones assured Plaintiffs that they qualified for the "best policy State Farm offered," that the Policy provided the "broadest form of coverage available today," and she would conduct herself "in accordance with Oklahoma law and would fully and

fairly investigate and pay claims." *Compare* Am. Pet., ¶¶ 10-11, 16 *with* Order at 4, *Marino*, No. CIV-22-885-HE, *and* Order at 4, *Goebel*, No. CIV-22-882-HE.

Plaintiffs' counsel have been warned that filing such a pleading, "containing false and/or inaccurate statements," as Plaintiffs' counsel have again done here, in federal court "is likely to result in significant sanctions." Order at 4, *Baltazar v. State Farm Fire & Cas. Co.*, No. CIV-22-928-HE (W.D. Okla. Aug. 8, 2023), attached hereto as Ex. 6. The facts of this case diverge significantly from the many others filed by Plaintiffs' counsel, but nonetheless, this Amended Petition does not. Plaintiffs have no cognizable claim against Jones, and the claims asserted against her should be dismissed.

## **CONCLUSION**

Based on the foregoing, there is no avenue through which Plaintiffs can establish a claim against Mary Lee Jones. Therefore, pursuant to 12 O.S. § 2012(B)(6), Jones respectfully moves to dismiss the Amended Petition against her. Leave to amend should not be granted because the defects identified herein are fatal and cannot be remedied. *See* 12 O.S. § 2012(G) ("On granting a motion to dismiss a claim for relief, the court shall grant leave to amend *if the defect can be remedied*") (emphasis added); *Williams v. Indep. Sch. Dist. No. 7 of Harrah*, 1994 OK CIV APP 87, ¶ 8, 881 P.2d 760, 763.

Respectfully submitted,

*Paige A. Masters*

Timila S. Gother, OBA # 14310
Paige A. Masters, OBA # 31142
Amanda M. Finch, OBA #34650
**CROWE & DUNLEVY, PC**
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-7700

Facsimile: (405) 239-6651
timila.rother@crowedunlevy.com
paige.masters@crowedunlevy.com
amanda.finch@crowedunlevy.com

**ATTORNEYS FOR DEFENDANT
MARY LEE JONES**

### CERTIFICATE OF SERVICE

This is to certify that on the 21st day of August 2023, the undersigned caused a true and correct copy of the above and foregoing to be mailed to:

Jeffrey D. Marr
Carole Dulisse
**MARR LAW FIRM**
4301 Southwest Third Street
Oklahoma City, Oklahoma 73108

Reggie N. Whitten
Michael Burrage
J. Revell Parrish
**WHITTEN BURRAGE**
512 North Broadway Ave., Suite 300
Oklahoma City, Oklahoma 73102

Chad E. Ihrig
Nick Marr
Ashton Poarch
**NIX PATTERSON, LLP**
8701 Bee Cave Road
Building 1, Suite 500
Austin, TX 78746

*Paige A. Masters*

**State Farm Fire and Casualty Company**
PO Box 853907
Richardson, TX 75085-3907

AT1            H-26- 2109-FAF3      T      F
   000346 0001
NEWTON, TRESSA DIANA & HARLEY
PO BOX 41
LONGDALE OK  73755-0041

ST-
0102-0000

Location:  1ST & WALNUT
           LONGDALE OK
           73755

SFPP No:

**Loss Settlement Provisions (See Policy)**
B1  Limited Replacement Cost - Coverage B

**Forms, Options, and Endorsements**
| | |
|---|---|
| Manufactured Home Policy | FP-7933.2 |
| Amendatory Endorsement | FE-7266.2 |
| Inflation and Dwelling Replace | FE-7528.3 |
| Mandatory Reportng Endorsement | FE-5801 |
| Manufactured Home Endorsement | FE-2400 |
| Earthquake Excl Masonry Veneer | FE-7300.4 |
| Actual Cash Value Endorsement | FE-3650 |
| Suit Against Us | FE-5676 |

Description: SOLITAIRE R973       Serial No: EHID-0K-E998FB

Please help us update the data used to determine your premium. Contact your agent with the year your
Manufactured Home's roof was last updated, including roof material.

138-3076 f.8 10-11-2010 (01038Se)

---

**RENEWAL CERTIFICATE**

POLICY NUMBER        36-EL-3429-6
Manufactured Home Policy
JUN 12 2020  to  JUN 12 2021

BILLED THROUGH SFPP

**Coverages and Limits**

**Section I**
| | | |
|---|---|---|
| A | Dwelling | $63,500 |
| | Dwelling Extension | 6,350 |
| B | Personal Property | 63,500 |
| C | Loss of Use | Actual Loss Sustained |

**Deductibles - Section I**
| | |
|---|---|
| Earthquake | 2% |
| Other Losses | 1,000 |

**Section II**
| | | |
|---|---|---|
| L | Personal Liability | $100,000 |
| | Damage to Property of Others | 500 |
| M | Medical Payments to Others (Each Person) | 1,000 |

**Annual Premium**                           $1,811.00

**Premium Reductions**
| | |
|---|---|
| Renewal Discount | 439.00 |
| Stability Discount | Included |
| Age Group Discount | 45.00 |

Inflation Coverage Index:   423.5

Thanks for letting us serve you.  We appreciate our long term customers.
Agent MARY LEE JONES CPCU, CLU
Telephone (580) 623-7368

Moving? See your State Farm agent.
See reverse for important information.
Prepared  APR 23 2020

N   0483
014  K1      4011  I      REP



EXHIBIT

Lienholder:   COMMUNITY STATE BANK
              Loan No:  N/A-Print on Paystub

**Your coverage amount....**
It is up to you to choose the coverages and limits that meet your needs subject to certain minimum requirements. Depending on the loss settlement provision provided by your policy, you must purchase a coverage limit at least equal to the estimated replacement cost or estimated actual cash value of your manufactured home. Replacement cost or actual cash value estimates are available from manufactured home dealers, or, your agent can provide an Xactware estimate using information you provide about your manufactured home. We can accept the type of estimate you choose as long as it provides a reasonable level of detail about your manufactured home. State Farm does not guarantee that any estimate will be the actual future cost to rebuild or replace your manufactured home. Higher limits may be available at higher premiums. We encourage you to periodically review your coverages and limits with your agent and to notify us of any changes or additions to your manufactured home.

**NOTICE TO POLICYHOLDER:**
For a comprehensive description of coverages and forms, p lease refer to your policy.
Policy changes requested before the "Date Prepared", which appear on this notice, are effective on the Renewal Date of this policy unless otherwise indicated by a separate endorsement, binder, or amended declarations. Any coverage forms attached to this notice are also effective on the Renewal Date of this policy.
Policy changes requested after the "Date Prepared" will be sent to you as an amended declarations or as an endorsement to your policy. Billing for any additional premium for such changes will be mailed at a later date.
If, during the past year, you've acquired any valuable property items, made any improvements to insured property, or have any questions about your insurance coverage, contact your Sta te Farm agent.
Please keep this with your policy.

301   (o1f008qh)  10-11-2010

State Farm Fire and Casualty Company     0484   36-EL-8429-8

553-2474

# PREMIUM ADJUSTMENT



Insurance premiums have been adjusted and continue to reflect the expected cost of claims. Some policyholders will see their premiums increase while other policyholders may see their premiums decrease or stay the same. The amount your premium changed, if at all, depends on several factors including the expected claim experience in your area, the coverage you have, and any applicable discounts or charges.

The enclosed Renewal Certificate reflects your new premium.

State Farm® works hard to offer you the best combination of cost, protection, and service. We will continue doing our best to make the most effective use of your premium dollars and give you superior service when you need it.

If you have any questions about your premium, or policy coverages, please contact your State Farm agent.

553-2474      (10/07)

Agent: MARY LEE JONES  CPCU, CLU         Telephone: (580) 623-7368
70   0484

**State Farm Fire and Casualty Company**

PO Box 853907
Richardson, TX 75085-3907

AT1          000658 0001      H-26-  2109-FAF3      T      F
COMMUNITY STATE BANK
PO BOX 549
CANTON OK  73724-0549

Insured:   NEWTON, TRESSA DIANA & HARLEY

Location:  1ST & WALNUT
           LONGDALE OK
           73755

SFPP No:

**Loss Settlement Provisions (See Policy)**
B1  Limited Replacement Cost - Coverage B

**Forms, Options, and Endorsements**
Manufactured Home Policy            FP-7933.2
Amendatory Endorsement              FE-7266.2
Inflation and Dwelling Replace      FE-7528.3
Mandatory Reporting Endorsement     FE-5801
Manufactured Home Endorsement       FE-2400
Earthquake Excl Masonry Veneer      FE-7300.4
Actual Cash Value Endorsement       FE-3650
Suit Against Us                     FE-5676

Description:  SOLITAIRE R973      Serial No:  EHID-0K-E998FB

Please help us update the data used to determine your premium. Contact your agent with the year your
Manufactured Home's roof was last updated, including roof material.

---

**RENEWAL CERTIFICATE**

POLICY NUMBER            -36-EL-3429-8
Manufactured Home Policy
JUN 12 2020  to  JUN 12 2021

BILLED THROUGH SFPP

**Coverages and Limits**
**Section I**
A  Dwelling                         $63,500
   Dwelling Extension                6,350
B  Personal Property                63,500
C  Loss of Use                      Actual Loss
                                    Sustained

**Deductibles - Section I**
   Earthquake                            2%
   Other Losses                      1,000

**Section II**
L  Personal Liability              $100,000
   Damage to Property of Others         500
M  Medical Payments to Others       1,000
   (Each Person)

**Annual Premium**                  $1,811.00

**Premium Reductions**
   Renewal Discount                  439.00
   Stability Discount               Included
   Age Group Discount                  45.00

Inflation Coverage Index:    423.5

---

*Thanks for letting us serve you.  We appreciate our long term customers.*
           **Agent** MARY LEE JONES  CPCU, CLU
           **Telephone** (580) 623-7368

Moving? See your State Farm agent.
See reverse for important information.
Prepared  APR 23 2020

REP

Lienholder:   COMMUNITY STATE BANK
Loan No:  N/A-Print on Paystub

**NOTICE TO POLICYHOLDER:**

For a comprehensive description of coverages and forms, p lease refer to your policy.

Policy changes requested before the "Date Prepared", which appear on this notice, are effective on the Renewal Date of this policy unless otherwise indicated by a separate endorsement, binder, or amended declarations. Any coverage forms attached to this notice are also effective on the Renewal Date of  this policy.

Policy changes requested after the "Date Prepared" will be sent to you as an amended declarations or as an endorsement to your policy. Billing for any additional premium for such   changes will be mailed at a later date.

If, during the past year, you've acquired any valuable property items, made any improvements to insured property, or have any questions about your insurance coverage, contact your Sta  te Farm agent.

Please keep this with your policy.

301     (o1f008qh) 10-11-2010



# Certified Policy Record

I, the undersigned, do hereby confirm that I am custodian of the records pertaining to the issuance of policies by State Farm Fire and Casualty Company.

I certify that the attached documents represent a true and accurate record of the terms and conditions of Policy Number 36-EL-8429-8 including any endorsements, if applicable, for the policy term(s) 06/12/2020 to 06/12/2021 and insuring NEWTON, TRESSA DIANA & HARLEY based on available records.

The policy was in effect on the loss date of 03/16/2021.

_Kourtney Jontry_
Kourtney Jontry
Underwriting Team Manager
Date: 02/09/2023

**EXHIBIT**

1011493

2000 157822 200 02-09-2022



State Farm®
**Manufactured Home
Policy**

FP-7933.2

## TABLE OF CONTENTS

### DECLARATIONS

Your Name
Location of Your Residence
Description of Your Manufactured Home
Policy Period
Coverages
Limits of Liability
Deductibles

**Begins on Page**

DECLARATIONS CONTINUED ...................................................................................1

DEFINITIONS .........................................................................................................1

SECTION I – YOUR PROPERTY
    COVERAGES .......................................................................................................3
        Coverage A – Dwelling.....................................................................................3
        Coverage B – Personal Property .......................................................................4
        Coverage C – Loss of Use................................................................................5
        Additional Coverages......................................................................................5
    LOSSES INSURED ..............................................................................................8
    LOSSES NOT INSURED ....................................................................................10
    LOSS SETTLEMENT ..........................................................................................12
    CONDITIONS ...................................................................................................13

SECTION II – YOUR LIABILITY
    COVERAGES .....................................................................................................16
        Coverage L – Personal Liability .......................................................................16
        Coverage M – Medical Payments to Others ......................................................16
        Additional Coverages......................................................................................16
    EXCLUSIONS....................................................................................................17
    CONDITIONS ...................................................................................................19

SECTION I AND SECTION II – CONDITIONS........................................................20

OPTIONAL POLICY PROVISIONS........................................................................22

FP-7933.2
Includes copyrighted material of State Farm Fire and Casualty Company.
Copyright, State Farm Fire and Casualty Company, 1983, 1992.
Printed in U.S.A.

# MANUFACTURED HOME POLICY

## DECLARATIONS CONTINUED

We agree to provide the insurance described in this policy:

1. based on your payment of premium for the coverages you chose;

2. based on your compliance with all applicable provisions of this policy; and

3. in reliance on your statements in these **Declarations**.

You agree, by acceptance of this policy, that:

1. you will pay premiums when due and comply with the provisions of the policy;

2. the statements in these **Declarations** are your statements and are true;

3. we insure you on the basis your statements are true; and

4. this policy contains all of the agreements between you and us and any of our agents.

Unless otherwise indicated in the application, you state that during the three years preceding the time of your application for this insurance your Loss History and Insurance History are as follows:

1. Loss History: you have not had any losses, insured or not; and

2. Insurance History: you have not had any insurer or agency cancel or refuse to issue or renew similar insurance to you or any household member.

## DEFINITIONS

"You" and "your" mean the "named insured" shown in the **Declarations**. Your spouse is included if a resident of your household. "We", "us" and "our" mean the Company shown in the **Declarations**.

Certain words and phrases are defined as follows:

1. "**bodily injury**" means physical injury, sickness, or disease to a person. This includes required care, loss of services and death resulting therefrom.

   **Bodily injury** does not include:

   a. any of the following which are communicable: disease, bacteria, parasite, virus, or other organism, any of which are transmitted by any **insured** to any other person;

   b. the exposure to any such disease, bacteria, parasite, virus, or other organism by any **insured** to any other person; or

   c. emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury unless it arises out of actual physical injury to some person.

2. "**business**" means a trade, profession or occupation. This includes farming.

3. "**Declarations**" means the policy **Declarations**, any amended **Declarations**, the most recent renewal notice or certificate, an Evidence of Insurance form or any endorsement changing any of these.

4. "**fungus**" means any type or form of fungi, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi.

5. "**insured**" means you and, if residents of your household:

   a. your relatives; and

   b. any other person under the age of 21 who is in the care of a person described above.

   Under Section II, "**insured**" also means:

   c. with respect to animals or watercraft to which this policy applies, the person or organization legally responsible for them. However, the animal or watercraft must be owned by you or a person included in 5.a. or 5.b. A person or organization using or having custody of these animals or watercraft in the course of a **business**, or without permission of the owner, is not an **insured**; and

1

d. with respect to any vehicle to which this policy applies, any person while engaged in your employment or the employment of a person included in 5.a. or 5.b.

6. "insured location" means:

   a. the residence premises;

   b. the part of any other premises, other structures and grounds used by you as a residence. This includes premises, structures and grounds you acquire while this policy is in effect for your use as a residence;

   c. any premises used by you in connection with the premises included in 6.a. or 6.b.;

   d. any part of a premises not owned by an insured but where an insured is temporarily residing;

   e. land owned by or rented to an insured on which a one or two family dwelling is being constructed as a residence for an insured;

   f. individual or family cemetery plots or burial vaults owned by an insured;

   g. any part of a premises occasionally rented to an insured for other than business purposes;

   h. vacant land owned by or rented to an insured. This does not include farm land; and

   i. farm land (without buildings), rented or held for rental to others, but not to exceed a total of 500 acres, regardless of the number of locations.

7. "in transit" means the period of time during which the leveling jacks or blocks are removed or all utilities are disconnected for the purpose of transporting the dwelling from one location to another. This applies whether or not the dwelling is momentarily in motion and whether on a public roadway or otherwise. The dwelling will not be considered in transit if it is being moved as an emergency measure to protect it from an impending loss from a Loss Insured.

8. "motor vehicle", when used in Section II of this policy, means:

   a. a land motor vehicle designed for travel on public roads or subject to motor vehicle registration;

   b. a trailer or semi-trailer designed for travel on public roads and subject to motor vehicle registration;

   c. a "recreational vehicle" while off an insured location. "Recreational vehicle", means a motorized vehicle designed for recreation principally off public roads that is owned or leased by an insured. This includes, but is not limited to, a motorized all terrain vehicle, amphibious vehicle, dune buggy, go-cart, golf cart, snowmobile, trailbike, minibike and personal assistive mobility device;

   d. a "locomotive" while off an insured location. "Locomotive" means a self-propelled vehicle for pulling or pushing freight or passenger cars on tracks that is large enough to carry a person and is owned or leased by an insured;

   e. a bulldozer, track loader, backhoe, high-hoe, trencher, grader, crane, self-propelled scraper, excavator, pipe-layer, cherry picker, telehandler, logging vehicle, mining vehicle or road building vehicle that is owned or leased by an insured while off an insured location;

   f. any vehicle while being towed or pushed by or carried on a vehicle included in a., b., c., d. or e.;

   g. the following are not motor vehicles:

      (1) a motorized land vehicle in dead storage on an insured location;

      (2) a boat, camp, home or utility trailer not being towed or pushed by or carried on a vehicle included in a., b., c., d. or e.;

      (3) a motorized golf cart while used for golfing purposes;

      (4) a motorized vehicle or trailer designed to assist the handicapped that is not designed for travel on public roads or subject to motor vehicle registration;

   h. "leased" does not include temporary rental.

2

9. **"occurrence"**, when used in Section II of this policy, means an accident, including exposure to conditions, which results in:

   a. **bodily injury**; or

   b. **property damage**;

   during the policy period. Repeated or continuous exposure to the same general conditions is considered to be one **occurrence**.

10. **"property damage"** means physical damage to or destruction of tangible property, including loss of use of this property. Theft or conversion of property by any **insured** is not **property damage**.

11. **"residence employee"** means an employee of an **insured** who performs duties, including household or domestic services, in connection with the maintenance or use of the **residence premises**. This includes employees who perform similar duties elsewhere for you. This does not include employees while performing duties in connection with the **business** of an **insured**.

12. **"residence premises"** means:

    a. the one, two, three or four-family dwelling, other structures and grounds; or

    b. that part of any other building;

    where you reside and which is shown in the Declarations.

# SECTION I - COVERAGES

## COVERAGE A - DWELLING

1. **Dwelling.** We cover the dwelling used principally as a private residence on the **residence premises** shown in the **Declarations**.

   Dwelling includes:

   a. structures attached to the dwelling;

   b. materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration or repair of the dwelling or other structures on the **residence premises**;

   c. foundation, floor slab and footings supporting the dwelling;

   d. wall-to-wall carpeting attached to the dwelling;

   e. parts, equipment, furniture and accessories which are built into and form a permanent part of the dwelling;

   f. permanently attached carports or garages, awnings, skirting, porches, tie-down equipment; and

   g. dwelling structure equipment.

2. **Dwelling Extension.** We cover other structures on the **residence premises**, separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line, or similar connection are considered to be other structures.

   We do not cover other structures:

   a. not permanently attached to or otherwise forming a part of the realty;

   b. used in whole or in part for **business** purposes unless such use consists solely of use of office space for paperwork, computer work or use of a telephone, and consists solely of activities that are:

      (1) duties of the **insured's** employment by another; and

      (2) performed solely by the **insured**; or

   c. rented or held for rental to a person not a tenant of the dwelling, unless used solely as a private garage.

3. **Property Not Covered.** We do not cover:

   a. land, including the land necessary to support any Coverage A property;

   b. any costs required to replace, rebuild, stabilize, or otherwise restore the land; or

   c. the costs of repair techniques designed to compensate for or prevent land instability to any property, whether or not insured under Coverage A.

3

## COVERAGE B - PERSONAL PROPERTY

1. **Property Covered**. We cover personal property owned or used by an **insured** while it is anywhere in the world. This includes structures not permanently attached to or otherwise forming a part of the realty. At your request, we will cover personal property owned by others while the property is on the part of the **residence premises** occupied exclusively by an **insured**. At your request, we will also cover personal property owned by a guest or a **residence employee**, while the property is in any other residence occupied by an **insured**.

   We cover personal property usually situated at an **insured's** residence, other than the **residence premises**, for up to $1,000 or 10% of the Coverage B limit, whichever is greater. This limitation does not apply to personal property in a newly acquired principal residence for the first 30 days after you start moving the property there. If the **residence premises** is a newly acquired principal residence, personal property in your immediate past principal residence is not subject to this limitation for the first 30 days after the inception of this policy.

   **Special Limits of Liability**. These limits do not increase the Coverage B limit. The special limit for each of the following categories is the total limit for each loss for all property in that category:

   a. $200 on money, coins and medals, including any of these that are a part of a collection, bank notes, bullion, gold other than goldware, silver other than silverware and platinum;

   b. $1,000 on property used or intended for use in a **business**, including merchandise held as samples or for sale or for delivery after sale, while on the **residence premises**. This coverage is limited to $250 on such property away from the **residence premises**.

   Electronic data processing system equipment or the recording or storage media used with that equipment is not included under this coverage;

   c. $1,000 on securities, checks, cashier's checks, traveler's checks, money orders and other

   negotiable instruments, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports and tickets;

   d. $1,000 on watercraft of all types and outboard motors, including their trailers, furnishings and equipment;

   e. $1,000 on trailers not used with watercraft;

   f. $1,000 for loss by theft of jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones;

   g. $2,500 on stamps, trading cards and comic books, including any of these that are a part of a collection;

   h. $2,500 for loss by theft of firearms;

   i. $2,500 for loss by theft of silverware and goldware;

   j. $5,000 on electronic data processing system equipment and the recording or storage media used with that equipment. There is no coverage for said equipment or media while located away from the **residence premises** except when said equipment or media are removed from the **residence premises** for the purpose of repair, servicing or temporary use. An **insured** student's equipment and media are covered while at a residence away from home; and

   k. $5,000 on any one article and $10,000 in the aggregate for loss by theft of any rug, carpet (except wall-to-wall carpet), tapestry, wall-hanging or other similar article.

2. **Property Not Covered**. We do not cover:

   a. articles separately described and specifically insured in this or any other insurance;

   b. animals, birds or fish;

   c. any engine or motor propelled vehicle or machine, including the parts, designed for movement on land. We do cover those not licensed for use on public highways which are:

(1) used solely to service the **insured location;** or

(2) designed for assisting the handicapped;

d. devices or instruments for the recording or reproduction of sound permanently attached to an engine or motor propelled vehicle. We do not cover tapes, wires, records or other mediums that may be used with these devices or instruments while in the vehicle;

e. aircraft and parts;

f. property of roomers, boarders, tenants and other residents not related to an **insured**. We do cover property of roomers, boarders and other residents related to an **insured;**

g. property regularly rented or held for rental to others by an **insured**. This exclusion does not apply to property of an **insured** in a sleeping room rented to others by an **insured;**

h. property rented or held for rental to others away from the **residence premises;**

i. any citizens band radios, radio telephones, radio transceivers, radio transmitters, radar or laser detectors, antennas and other similar equipment permanently attached to an engine or motor propelled vehicle;

j. books of account, abstracts, drawings, card index systems and other records. This exclusion does not apply to any recording or storage media for electronic data processing. We will cover the cost of blank books, cards or other blank material plus the cost of labor you incur for transcribing or copying such records;

k. recording or storage media for electronic data processing that cannot be replaced with other of like kind and quality on the current retail market;

l. appliances, equipment and accessories which are built into and form a permanent part of the dwelling; or

m. tires and wheels detached from the dwelling and while away from the **residence premises.**

## COVERAGE C - LOSS OF USE

1. **Additional Living Expense.** When a Loss Insured causes the **residence premises** to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months. This coverage is not reduced by the expiration of this policy.

2. **Fair Rental Value.** When a Loss Insured causes that part of the **residence premises** rented to others or held for rental by you to become uninhabitable, we will cover its fair rental value. Payment shall be for the shortest time required to repair or replace the part of the premises rented or held for rental, but not to exceed 12 months. This period of time is not limited by expiration of this policy. Fair rental value shall not include any expense that does not continue while that part of the **residence premises** rented or held for rental is uninhabitable.

3. **Prohibited Use.** When a civil authority prohibits your use of the **residence premises** because of direct damage to a neighboring premises by a Loss Insured, we will cover any resulting Additional Living Expense and Fair Rental Value. Coverage is for a period not exceeding two weeks while use is prohibited.

   We do not cover loss or expense due to cancellation of a lease or agreement.

## SECTION I - ADDITIONAL COVERAGES

The following Additional Coverages are subject to all the terms, provisions, exclusions and conditions of this policy.

1. **Debris Removal.** We will pay the reasonable expenses you incur in the removal of debris of covered property damaged by a Loss Insured. This expense is included in the limit applying to the damaged property.

When the amount payable for the property damage plus the debris removal exceeds the limit for the damaged property, an additional 5% of that limit is available for debris removal expense. This additional amount of insurance does not apply to Additional Coverage, item 3. Trees, Shrubs and Other Plants.

We will also pay up to $500 in the aggregate for each loss to cover the reasonable expenses you incur in the removal of tree debris from the **residence premises** when the tree has caused a Loss Insured to Coverage A property.

2.  **Temporary Repairs**. If damage is caused by a Loss Insured, we will pay the reasonable and necessary cost you incur for temporary repairs to covered property to protect the property from further immediate damage or loss. This coverage does not increase the limit applying to the property being repaired.

3.  **Trees, Shrubs and Other Plants**. We cover outdoor trees, shrubs, plants or lawns, on the **residence premises**, for direct loss caused by the following: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles (not owned or operated by a resident of the **residence premises**), Vandalism or malicious mischief or Theft.

    The limit for this coverage, including the removal of debris, shall not exceed 5% of the amount shown in the **Declarations** for COVERAGE A - DWELLING. We will not pay more than $500 for any one outdoor tree, shrub or plant, including debris removal expense. This coverage may increase the limit otherwise applicable. We do not cover property grown for **business** purposes.

4.  **Fire Department Service Charge**. We will pay up to $500 for your liability assumed by contract or agreement for fire department charges. This means charges incurred when the fire department is called to save or protect covered property from a Loss Insured. No deductible applies to this coverage. This coverage may increase the limit otherwise applicable.

5.  **Property Removed**. Covered property, while being removed from a premises endangered by a Loss Insured, is covered for any accidental direct physical loss. This coverage also applies to the property for up to 30 days while removed. We will also pay for reasonable expenses incurred by you for the removal and return of the covered property. This coverage does not increase the limit applying to the property being removed.

6.  **Credit Card, Bank Fund Transfer Card, Forgery and Counterfeit Money.**

    a.  We will pay up to $1,000 for:

        (1) the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards and bank fund transfer cards issued to or registered in an **insured's** name. If an **insured** has not complied with all terms and conditions under which the cards are issued, we do not cover use by an **insured** or anyone else;

        (2) loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

        (3) loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

        No deductible applies to this coverage.

        We will not pay more than the limit stated above for forgery or alteration committed by any one person. This limit applies when the forgery or alteration involves one or more instruments in the same loss.

    b.  We do not cover loss arising out of **business** pursuits or dishonesty of an **insured**.

    c.  Defense:

        (1) We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend claims or suits ends when the amount we pay for the loss equals our limit of liability.

        (2) If claim is made or a suit is brought against an **insured** for liability under the Credit Card or Bank Fund Transfer Card coverage, we will provide a defense. This defense is at our expense by counsel of our choice.

6

(3) We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Power Interruption.** We cover accidental direct physical loss caused directly or indirectly by a change of temperature which results from power interruption that takes place on the **residence premises**. The power interruption must be caused by a Loss Insured occurring on the **residence premises**. The power lines off the **residence premises** must remain energized. This coverage does not increase the limit applying to the damaged property.

8. **Refrigerated Products.** Coverage B is extended to cover the contents of deep freeze or refrigerated units on the **residence premises** for loss due to power failure or mechanical failure. If mechanical failure or power failure is known to you, all reasonable means must be used to protect the property insured from further damage or this coverage is void. Power failure or mechanical failure shall not include:

   a. removal of a plug from an electrical outlet; or

   b. turning off an electrical switch unless caused by a Loss Insured.

   This coverage does not increase the limit applying to the damaged property.

9. **Arson Reward.** We will pay $1,000 for information which leads to an arson conviction in connection with a fire loss to property covered by this policy. This coverage may increase the limit otherwise applicable. However, the $1,000 limit shall not be increased regardless of the number of persons providing information. No deductible applies to this coverage.

10. **Volcanic Action.** We cover direct physical loss to a covered building or covered property contained in a building resulting from the eruption of a volcano when the loss is directly and immediately caused by:

    a. volcanic blast or airborne shock waves;

    b. ash, dust or particulate matter; or

    c. lava flow.

    We will also pay for the removal of that ash, dust or particulate matter which has caused direct physical loss to a covered building or covered property contained in a building.

One or more volcanic eruptions that occur within a 72-hour period shall be considered one volcanic eruption.

This coverage does not increase the limit applying to the damaged property.

11. **Collapse.** We insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building.

    Collapse means actually fallen down or fallen into pieces. It does not include settling, cracking, shrinking, bulging, expansion, sagging or bowing.

    The collapse must be directly and immediately caused only by one or more of the following:

    a. perils described in **SECTION I - LOSSES INSURED, COVERAGE B - PERSONAL PROPERTY.** These perils apply to covered building and personal property for loss insured by this Additional Coverage;

    b. hidden decay of a supporting or weight-bearing structural member of the building;

    c. hidden insect or vermin damage to a structural member of the building;

    d. weight of contents, equipment, animals or people;

    e. weight of ice, snow, sleet or rain which collects on a roof; or

    f. use of defective material or methods in the construction (includes remodeling or renovation) of the building, if the collapse occurs during the course of the construction of the building.

    Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e. and f. unless the loss is the direct and immediate cause of the collapse of the building.

    This coverage does not increase the limit applying to the damaged property.

12. **Locks.** We will pay the reasonable expenses you incur to re-key locks on exterior doors of the dwelling located on the **residence premises**, when the keys to those locks are a part of a covered theft loss.

    No deductible applies to this coverage.

# SECTION I - LOSSES INSURED

## COVERAGE A - DWELLING

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I - LOSSES NOT INSURED**.

## COVERAGE B - PERSONAL PROPERTY

We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in **SECTION I - LOSSES NOT INSURED**:

1. **Fire or lightning.**

2. **Windstorm or hail.** This peril does not include loss to property contained in a building caused by rain, snow, sleet, sand or dust. This limitation does not apply when the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft**, including self-propelled missiles and spacecraft.

6. **Vehicles**, meaning impact by a vehicle.

7. **Smoke**, meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief**, meaning only willful and malicious damage to or destruction of property.

9. **Theft**, including attempted theft and loss of property from a known location when it is probable that the property has been stolen.

This peril does not include:

a. loss of a precious or semi-precious stone from its setting;

b. loss caused by theft:

   (1) committed by an **insured** or by any other person regularly residing on the **insured location**. Property of a student who is an **insured** is covered while located at a residence away from home, if the theft is committed by a person who is not an **insured**;

   (2) in or to a dwelling under construction or of materials and supplies for use in the construction until the dwelling is completed and occupied; or

   (3) from the part of a **residence premises** rented to others:

      (a) caused by a tenant, members of the tenant's household, or the tenant's employees;

      (b) of money, bank notes, bullion, gold, goldware, silver, silverware, pewterware, platinum, coins and medals;

      (c) of securities, checks, cashier's checks, traveler's checks, money orders and other negotiable instruments, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps; or

      (d) of jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones;

c. loss caused by theft that occurs away from the **residence premises** of:

(1) property while at any other residence owned, rented to, or occupied by an **insured**, except while an **insured** is temporarily residing there. Property of a student who is an **insured** is covered while at a residence away from home;

(2) watercraft of all types, including their furnishings, equipment and outboard motors; or

(3) trailers and campers designed to be pulled by or carried on a vehicle.

If the **residence premises** is a newly acquired principal residence, property in the immediate past principal residence shall not be considered property away from the **residence premises** for the first 30 days after the inception of this policy.

10. **Falling objects**. This peril does not include loss to property contained in a building unless the roof or an exterior wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Sudden and accidental discharge or overflow** of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance.

This peril does not include loss:

a. to the system or appliance from which the water or steam escaped;

b. caused by or resulting from freezing;

c. caused by or resulting from water or sewage from outside the **residence premises** plumbing system that enters through sewers or drains, or water which enters into and overflows from within a sump pump, sump pump well or any other system

designed to remove subsurface water which is drained from the foundation area; or

d. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, or wet or dry rot.

13. **Sudden and accidental tearing asunder, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

This peril does not include loss:

a. caused by or resulting from freezing; or

b. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, or wet or dry rot.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or of a household appliance.

This peril does not include loss on the **residence premises** while the dwelling is vacant, unoccupied or being constructed, unless you have used reasonable care to:

a. maintain heat in the building; or

b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage** to electrical appliances, devices, fixtures and wiring from an increase or decrease of artificially generated electrical current. We will pay up to $1,000 under this peril for each damaged item described above.

16. **Breakage of glass**, meaning damage to personal property caused by breakage of glass which is a part of a building on the **residence premises**. There is no coverage for loss or damage to the glass.

# SECTION I - LOSSES NOT INSURED

1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through o. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

   a. collapse, except as specifically provided in **SECTION I - ADDITIONAL COVERAGES, Collapse**;

   b. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion only applies while the dwelling is vacant, unoccupied or being constructed. This exclusion does not apply if you have used reasonable care to:

      (1) maintain heat in the building; or

      (2) shut off the water supply and drain the system and appliances of water;

   c. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a swimming pool, hot tub or spa, including their filtration and circulation systems, fence, pavement, patio, foundation, retaining wall, bulkhead, pier, wharf or dock;

   d. theft in or to a dwelling under construction, or of materials and supplies for use in the construction, until the dwelling is completed and occupied;

   e. vandalism or malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

   f. continuous or repeated seepage or leakage of water or steam from a:

      (1) heating, air conditioning or automatic fire protective sprinkler system;

      (2) household appliance; or

      (3) plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors;

   which occurs over a period of time. If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which the water or steam escaped;

   g. wear, tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown;

   h. corrosion, electrolysis or rust;

   i. wet or dry rot;

   j. contamination;

   k. smog, smoke from agricultural smudging or industrial operations;

   l. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundation, walls, floors, roofs or ceilings;

   m. birds, vermin, rodents, insects, or domestic animals. We do cover the breakage of glass or safety glazing material which is a part of a building, when caused by birds, vermin, rodents, insects or domestic animals;

   n. seizure by a governmental authority; or

   o. pressure from or presence of tree, shrub or plant roots.

   However, we do insure for any resulting loss from items a. through n. unless the resulting loss is itself a Loss Not Insured by this Section.

2.  We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

    a.  **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, demolition, sale, occupancy or placement of a building or other structure.

    b.  **Earth Movement,** meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mudflow, mudslide, sinkhole, subsidence, erosion or movement resulting from improper compaction, site selection or any other external forces. Earth movement also includes volcanic explosion or lava flow, except as specifically provided in **SECTION I - ADDITIONAL COVERAGES, Volcanic Action.**

        However, we do insure for any direct loss by fire resulting from earth movement, provided the resulting fire loss is itself a Loss Insured.

    c.  **Water Damage,** meaning:

        (1) flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, or spray from any of these, all whether driven by wind or not;

        (2) water or sewage from outside the **residence premises** plumbing system that enters through sewers or drains, or water which enters into and overflows from within a sump pump, sump pump well or any other system designed to remove subsurface water which is drained from the foundation area; or

        (3) water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

        However, we do insure for any direct loss by fire, explosion or theft resulting from water damage, provided the resulting loss is itself a Loss Insured.

    d.  **Neglect,** meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered.

    e.  **War,** including any undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

    f.  **Nuclear Hazard,** meaning any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these. Loss caused by the nuclear hazard shall not be considered loss caused by fire, explosion or smoke.

        However, we do insure for any direct loss by fire resulting from the nuclear hazard, provided the resulting fire loss is itself a Loss Insured.

    g.  **Conversion, Embezzlement or Secretion** by the selling dealer or by any person in lawful possession or custody of the insured property.

    h.  Any Loss Insured other than fire while the dwelling is **in transit.**

    i.  Any Loss Insured while the dwelling is at any location not described in this policy. This exclusion does not apply if you or someone on your behalf has notified **us** or our agent of the move within 60 days from the start of the move.

    j.  **Fungus,** including the growth, proliferation, spread or presence of **fungus,** and including:

(1) any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the described premises or location of the rebuilding, repair or replacement of that property, by **fungus**;

(2) any remediation of **fungus**, including the cost or expense to:

    (a) remove or clean the **fungus** from covered property or to repair, restore or replace that property;

    (b) tear out and replace any part of the building or other property as needed to gain access to the **fungus**;

    (c) contain, treat, detoxify, neutralize or dispose of or in any way respond to or assess the effects of the **fungus**; or

    (d) remove any property to protect it from the presence of or exposure to **fungus**;

(3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence or level of **fungus**, whether performed prior to, during or after removal, repair, restoration or replacement of covered property.

3. We do not insure under any coverage for any loss consisting of one or more of the items below. Further,

we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

a. conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent, or without fault;

b. defect, weakness, inadequacy, fault or unsoundness in:

    (1) planning, zoning, development, surveying, siting;

    (2) design, specifications, workmanship, construction, grading, compaction;

    (3) materials used in construction or repair; or

    (4) maintenance;

    of any property (including land, structures, or improvements of any kind) whether on or off the **residence premises**; or

c. weather conditions.

However, we do insure for any resulting loss from items a., b. and c. unless the resulting loss is itself a Loss Not Insured by this Section.

## SECTION I - LOSS SETTLEMENT

**COVERAGE A - DWELLING**

Losses to property covered under **SECTION I - COVERAGES, COVERAGE A - DWELLING** are settled at actual cash value at the time of loss. This means there may be deduction for depreciation.

We will pay the lower of:

1. the actual cash value at the time of the loss of the damaged part of the property;

2. the amount necessary to repair or replace;

3. any limit of liability described in the policy; or

4. any applicable Coverage A limit of liability.

**COVERAGE B - PERSONAL PROPERTY**

Only the Loss Settlement provision shown in the Declarations applies. We will settle covered property losses according to the following:

1. **B1 - Limited Replacement Cost Loss Settlement.**

    a. We will pay the cost to repair or replace property covered under **SECTION I - COVERAGES, COVERAGE B - PERSONAL PROPERTY**, except for property listed in item b. below, subject to the following:

(1) until repair or replacement is completed, we will pay only the cost to repair or replace less depreciation;

(2) after repair or replacement is completed, we will pay the difference between the cost to repair or replace less depreciation and the cost you have actually and necessarily spent to repair or replace the property; and

(3) if property is not repaired or replaced within two years after the date of loss, we will pay only the cost to repair or replace less depreciation.

b.  We will pay market value at the time of loss for:

(1) antiques, fine arts, paintings, statuary and similar articles which by their inherent nature cannot be replaced with new articles;

(2) articles whose age or history contribute substantially to their value including, but not limited to, memorabilia, souvenirs and collectors items; and

(3) property not useful for its intended purpose.

However, we will not pay an amount exceeding the smallest of the following for items a. and b. above:

(1) our cost to replace at the time of loss;

(2) the full cost of repair;

(3) any special limit of liability described in the policy; or

(4) any applicable Coverage B limit of liability.

2.  **B2 - Depreciated Loss Settlement**.

a.  We will pay the cost to repair or replace less depreciation at the time of loss for property covered under **SECTION I - COVERAGES, COVERAGE B - PERSONAL PROPERTY**, except for property listed in item b. below.

b.  We will pay market value at the time of loss for:

(1) antiques, fine arts, paintings, statuary and similar articles which by their inherent nature cannot be replaced with new articles;

(2) articles whose age or history contribute substantially to their value including, but not limited to, memorabilia, souvenirs and collectors items; and

(3) property not useful for its intended purpose.

However, we will not pay an amount exceeding the smallest of the following for items a. and b. above:

(1) our cost to replace at the time of loss;

(2) the full cost of repair;

(3) any special limit of liability described in the policy; or

(4) any applicable Coverage B limit of liability.

## SECTION I - CONDITIONS

1.  **Insurable Interest and Limit of Liability**. Even if more than one person has an insurable interest in the property covered, we shall not be liable:

a.  to the **insured** for an amount greater than the **insured's** interest; or

b.  for more than the applicable limit of liability.

2.  **Your Duties After Loss**. After a loss to which this insurance may apply, you shall see that the following duties are performed:

a.  give immediate notice to us or our agent. Also notify the police if the loss is caused by theft. Also

notify the credit card company or bank if the loss involves a credit card or bank fund transfer card;

b.  protect the property from further damage or loss, make reasonable and necessary temporary repairs required to protect the property, keep an accurate record of repair expenditures;

c.  prepare an inventory of damaged or stolen personal property. Show in detail the quantity, description, age, actual cash value and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

d.  as often as we reasonably require:

   (1)  exhibit the damaged property;

   (2)  provide us with records and documents we request and permit us to make copies;

   (3)  submit to and subscribe, while not in the presence of any other **insured**:

      (a)  statements; and

      (b)  examinations under oath; and

   (4)  produce employees, members of the **insured's** household or others for examination under oath to the extent it is within the **insured's** power to do so; and

e.  submit to us, within 60 days after the loss, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   (1)  the time and cause of loss;

   (2)  interest of the **insured** and all others in the property involved and all encumbrances on the property;

   (3)  other insurance which may cover the loss;

   (4)  changes in title or occupancy of the property during the term of this policy;

   (5)  specifications of any damaged building and detailed estimates for repair of the damage;

   (6)  an inventory of damaged or stolen personal property described in 2.c.;

   (7)  receipts for additional living expenses incurred and records supporting the fair rental value loss; and

   (8)  evidence or affidavit supporting a claim under the Credit Card, Bank Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3.  **Loss to a Pair or Set**. In case of loss to a pair or set, we may elect to:

a.  repair or replace any part to restore the pair or set to its value before the loss; or

b.  pay the difference between the depreciated value of the property before and after the loss.

4.  **Glass Replacement**. Loss for damage to glass caused by a Loss Insured shall be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

5.  **Appraisal**. If you and we fail to agree on the amount of loss, either one can demand that the amount of the loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, disinterested appraiser. Each shall notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the **residence premises** is located to select an umpire. The appraisers shall then set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss. Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us.

6.  **Other Insurance**. If a loss covered by this policy is also covered by other insurance, we will pay only our share of the loss. Our share is the proportion of the loss that the applicable limit under this policy bears to the total amount of insurance covering the loss.

7.  **Suit Against Us**. No action shall be brought unless there has been compliance with the policy provisions. The action must be started within one year after the date of loss or damage.

8.  **Our Option**. We may repair or replace any part of the property damaged or stolen with similar property. Any property we pay for or replace becomes our property.

9. **Loss Payment**. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

a. reach agreement with you;

b. there is an entry of a final judgment; or

c. there is a filing of an appraisal award with us.

10. **Abandonment of Property**. We need not accept any property abandoned by an **insured**.

11. **Lienholder Clause**. The word "lienholder" includes trustee.

a. If a lienholder is named in this policy, any loss payable under Coverage A shall be paid to the lienholder and you, as interests appear. If more than one lienholder is named, the order of payment shall be the same as the order of precedence of the liens.

b. If we deny your claim, that denial shall not apply to a valid claim of the lienholder, if the lienholder:

   (1) notifies us of any change in ownership, occupancy or substantial change in risk of which the lienholder is aware, provided that the conversion, embezzlement, or concealment by an **insured** having possession of the dwelling is not covered under Section I of this policy;

   (2) pays on demand any premium due under this policy, if you have not paid the premium; and

   (3) submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the lienholder.

c. If this policy is cancelled by us, the lienholder shall be notified at least 10 days before the date cancellation takes effect. Proof of mailing shall be proof of notice.

d. If we pay the lienholder for any loss and deny payment to you:

   (1) we are subrogated to all the rights of the lienholder granted under the lien on the property; or

   (2) at our option, we may pay to the lienholder the whole principal on the lien plus any accrued interest. In this event, we shall receive a full assignment and transfer of the lien and all securities held as collateral to the lien debt.

e. Subrogation shall not impair the right of the lienholder to recover the full amount of the lienholder's claim.

12. **No Benefit to Bailee**. We will not recognize an assignment or grant coverage for the benefit of a person or organization holding, storing or transporting property for a fee. This applies regardless of any other provision of this policy.

13. **Intentional Acts**. If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void and we will not pay you or any other **insured** for this loss.

14. **Replacement of Dwelling**. If you replace your dwelling, we will provide coverage on the replacement. This condition applies only if you notify us within 60 days after delivery of the replacement and pay any additional premium required.

15. **Protection of Insured Property**. When insured property is endangered by a Loss Insured, you shall use all reasonable means to protect the property from loss or further loss.

# SECTION II - LIABILITY COVERAGES

## COVERAGE L - PERSONAL LIABILITY

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence**, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2. provide a defense at our expense by counsel of our choice. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages, to effect settlement or satisfy a judgment resulting from the **occurrence**, equals our limit of liability.

## COVERAGE M - MEDICAL PAYMENTS TO OTHERS

We will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing **bodily injury**. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage applies only:

1. to a person on the **insured location** with the permission of an **insured**;

2. to a person off the **insured location**, if the **bodily injury**:

   a. arises out of a condition on the **insured location** or the ways immediately adjoining;

   b. is caused by the activities of an **insured**;

   c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or

   d. is caused by an animal owned by or in the care of an **insured**; or

3. to a **residence employee** if the **occurrence** causing **bodily injury** occurs off the **insured location** and arises out of or in the course of the **residence employee's** employment by an **insured**.

## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

   a. expenses we incur and costs taxed against an **insured** in suits we defend;

   b. premiums on bonds required in suits we defend, but not for bond amounts greater than the Coverage L limit. We are not obligated to apply for or furnish any bond;

   c. reasonable expenses an **insured** incurs at our request. This includes actual loss of earnings (but not loss of other income) up to $100 per day for aiding us in the investigation or defense of claims or suits;

   d. prejudgment interest awarded against the **insured** on that part of the judgment we pay; and

   e. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **insured**.

3. **Damage to Property of Others.**

   a. We will pay for **property damage** to property of others caused by an **insured**.

   b. We will not pay more than the smallest of the following amounts:

      (1) replacement cost at the time of loss;

      (2) full cost of repair; or

      (3) $500 in any one **occurrence**.

   c. We will not pay for **property damage**:

      (1) if insurance is otherwise provided in this policy;

16

(2) caused intentionally by an **insured** who is 13 years of age or older;

(3) to property, other than a rented golf cart, owned by or rented to an **insured**, a tenant of an **insured**, or a resident in your household; or

(4) arising out of:

    (a) **business** pursuits;

(b) any act or omission in connection with a premises an **insured** owns, rents or controls, other than the **insured location**; or

(c) the ownership, maintenance, or use of a **motor vehicle**, aircraft, or watercraft, including airboat, air cushion, personal watercraft, sail board or similar type watercraft.

## SECTION II - EXCLUSIONS

1. Coverage L and Coverage M do not apply to:

   a. **bodily injury** or property damage:

     (1) which is either expected or intended by the **insured**; or

     (2) which is the result of willful and malicious acts of the **insured**;

   b. **bodily injury** or **property damage** arising out of **business** pursuits of any **insured** or the rental or holding for rental of any part of any premises by any **insured**. This exclusion does not apply:

     (1) to activities which are ordinarily incident to non-**business** pursuits;

     (2) with respect to Coverage L to the occasional or part-time **business** pursuits of an **insured** who is under 19 years of age;

     (3) to the rental or holding for rental of a residence of yours:

       (a) on an occasional basis for the exclusive use as a residence;

       (b) in part, unless intended for use as a residence by more than two roomers or boarders; or

       (c) in part, as an office, school, studio or private garage;

     (4) when the dwelling on the **residence premises** is a two, three or four-family dwelling and you occupy one part and rent or hold for rental the other part; or

     (5) to farm land (without buildings), rented or held for rental to others, but not to exceed a total of 500 acres, regardless of the number of locations;

   c. **bodily injury** or **property damage** arising out of the rendering or failing to render professional services;

   d. **bodily injury** or **property damage** arising out of any premises currently owned or rented to any **insured** which is not an **insured location**. This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**;

   e. **bodily injury** or **property damage** arising out of the ownership, maintenance, use, loading or unloading of:

     (1) an aircraft;

     (2) a **motor vehicle** owned or operated by or rented or loaned to any **insured**; or

     (3) a watercraft:

       (a) owned by or rented to any **insured** if it has inboard or inboard-outdrive motor power of more than 50 horsepower;

       (b) owned by or rented to any **insured** if it is a sailing vessel, with or without auxiliary power, 26 feet or more in overall length;

17

(c) powered by one or more outboard motors with more than 25 total horsepower owned by any **insured**;

(d) designated as an airboat, air cushion, or similar type of craft; or

(e) owned by any **insured** which is a personal watercraft using a water jet pump powered by an internal combustion engine as the primary source of propulsion.

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**. Exclusion e.(3) does not apply while the watercraft is on the **residence premises**;

f. **bodily injury** or **property damage** arising out of:

(1) the entrustment by any **insured** to any person;

(2) the supervision by any **insured** of any person;

(3) any liability statutorily imposed on any **insured**; or

(4) any liability assumed through an unwritten or written agreement by any **insured**;

with regard to the ownership, maintenance or use of any aircraft, watercraft, or **motor vehicle** which is not covered under Section II of this policy;

g. **bodily injury** or **property damage** caused directly or indirectly by war, including undeclared war, or any warlike act including destruction or seizure or use for a military purpose, or any consequence of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental;

h. **bodily injury** to you or any **insured** within the meaning of part a. or b. of the definition of **insured**.

This exclusion also applies to any claim made or suit brought against you or any **insured** to share damages with or repay someone else who may be obligated to pay damages because of the **bodily**

injury sustained by you or any **insured** within the meaning of part a. or b. of the definition of **insured**;

i. any claim made or suit brought against any **insured** by:

(1) any person who is in the care of any **insured** because of child care services provided by or at the direction of:

(a) any **insured**;

(b) any employee of any **insured**; or

(c) any other person actually or apparently acting on behalf of any **insured**; or

(2) any person who makes a claim because of **bodily injury** to any person who is in the care of any **insured** because of child care services provided by or at the direction of:

(a) any **insured**;

(b) any employee of any **insured**; or

(c) any other person actually or apparently acting on behalf of any **insured**.

This exclusion does not apply to the occasional child care services provided by any **insured**, or to the part-time child care services provided by any **insured** who is under 19 years of age;

j. **bodily injury** or **property damage** arising out of an **insured's** participation in, or preparation or practice for any prearranged or organized race, speed or demolition contest, or similar competition involving a motorized land vehicle or motorized watercraft. This exclusion does not apply to a sailing vessel less than 26 feet in overall length with or without auxiliary power; or

k. any:

(1) **bodily injury** or **property damage** arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any **fungus** at or from any source or location; or

(2) loss, cost or expense arising out of any:

    (a) request, demand or order that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate or dispose of or in any way respond to or assess the effects of **fungus**; or

    (b) claim or suit for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of **fungus**.

2. Coverage L does not apply to:

  a. liability:

    (1) for your share of any loss assessment charged against all members of an association of property owners; or

    (2) assumed under any unwritten contract or agreement, or by contract or agreement in connection with a **business** of the **insured**;

  b. **property damage** to property currently owned by any **insured**;

  c. **property damage** to property rented to, occupied or used by or in the care of any **insured**. This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d. **bodily injury** to a person eligible to receive any benefits required to be provided or voluntarily provided by an **insured** under a workers' compensation, non-occupational disability, or occupational disease law;

e. **bodily injury** or **property damage** for which an **insured** under this policy is also an insured under a nuclear energy liability policy or would be an insured but for its termination upon exhaustion of its limit of liability. A nuclear energy liability policy is a policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors.

3. Coverage M does not apply to **bodily injury**:

  a. to a **residence employee** if it occurs off the **insured location** and does not arise out of or in the course of the **residence employee's** employment by an **insured**;

  b. to a person eligible to receive any benefits required to be provided or voluntarily provided under any workers' compensation, non-occupational disability or occupational disease law;

  c. from nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these;

  d. to a person other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

## SECTION II - CONDITIONS

1. **Limit of Liability.** The Coverage L limit is shown in the **Declarations**. This is our limit for all damages from each **occurrence** regardless of the number of **insureds**, claims made or persons injured.

The Coverage M limit is shown in the **Declarations**. This is our limit for all medical expense for **bodily injury** to one person as the result of one accident.

2. **Severability of Insurance.** This insurance applies separately to each **insured**. This condition shall not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss.** In case of an accident or **occurrence**, the **insured** shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:

  a. give written notice to us or our agent as soon as practicable, which sets forth:

    (1) the identity of this policy and **insured**;

    (2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

19

(3) names and addresses of any claimants and available witnesses;

b. immediately forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

c. at our request, assist in:

(1) making settlement;

(2) the enforcement of any right of contribution or indemnity against a person or organization who may be liable to an **insured**;

(3) the conduct of suits and attend hearings and trials; and

(4) securing and giving evidence and obtaining the attendance of witnesses;

d. under the coverage - **Damage to Property of Others**, exhibit the damaged property if within the **insured's** control; and

e. the **insured** shall not, except at the **insured's** own cost, voluntarily make payments, assume obligations or incur expenses. This does not apply to expense for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person - Coverage M**. The injured person, or, when appropriate, someone acting on behalf of that person, shall:

a. give us written proof of claim, under oath if required, as soon as practicable;

b. execute authorization to allow us to obtain copies of medical reports and records; and

c. submit to physical examination by a physician selected by us when and as often as we reasonably require.

5. **Payment of Claim - Coverage M**. Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us**. No action shall be brought against us unless there has been compliance with the policy provisions.

No one shall have the right to join us as a party to an action against an **insured**. Further, no action with respect to Coverage L shall be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured**. Bankruptcy or insolvency of an **insured** shall not relieve us of our obligation under this policy.

8. **Other Insurance - Coverage L**. This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTION I AND SECTION II - CONDITIONS

1. **Policy Period**. This policy applies only to loss under Section I or **bodily injury** or **property damage** under Section II which occurs during the period this policy is in effect.

2. **Concealment or Fraud**. This policy is void as to you and any other **insured**, if you or any other **insured** under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

3. **Liberalization Clause**. If we adopt any revision which would broaden coverage under this policy without additional premium, within 60 days prior to or during the period this policy is in effect, the broadened coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions**. A waiver or change of any provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination shall not waive any of our rights.

5. **Cancellation**.

a. You may cancel this policy at any time by notifying us in writing of the date cancellation is to take effect. We may waive the requirement that the notice be in writing by confirming the date and time of cancellation to you in writing.

b.  We may cancel this policy only for the reasons stated in this condition. We will notify you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the **Declarations**. Proof of mailing shall be sufficient proof of notice:

(1)  When you have not paid the premium, we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect. This condition applies whether the premium is payable to us or our agent or under any finance or credit plan.

(2)  When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason. We may cancel by notifying you at least 10 days before the date cancellation takes effect.

(3)  When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

(a)  if there has been a material misrepresentation of fact which, if known to us, would have caused us not to issue this policy; or

(b)  if the risk has changed substantially since the policy was issued.

We may cancel this policy by notifying you at least 30 days before the date cancellation takes effect.

(4)  When this policy is written for a period longer than one year, we may cancel for any reason at anniversary. We may cancel by notifying you at least 30 days before the date cancellation takes effect.

c.  When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded. When you request cancellation, the return premium will be based on our rules for such cancellation. The return premium

may be less than a full pro rata refund. When we cancel, the return premium will be pro rata.

d.  The return premium may not be refunded with the notice of cancellation or when the policy is returned to us. In such cases, we will refund it within a reasonable time after the date cancellation takes effect.

6.  **Nonrenewal.** We may elect not to renew this policy. If we elect not to renew, a written notice will be delivered to you, or mailed to you at your mailing address shown in the **Declarations**. The notice will be mailed or delivered at least 30 days before the expiration date of this policy. Proof of mailing shall be sufficient proof of notice.

7.  **Assignment.** Assignment of this policy shall not be valid unless we give our written consent.

8.  **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an **insured** shall:

a.  sign and deliver all related papers;

b.  cooperate with us in a reasonable manner; and

c.  do nothing after a loss to prejudice such rights.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9.  **Death.** If any person shown in the **Declarations** or the spouse, if a resident of the same household, dies:

a.  we insure the legal representative of the deceased. This condition applies only with respect to the premises and property of the deceased covered under this policy at the time of death;

b.  **insured** includes:

(1)  any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

(2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

10. **Conformity to State Law.** When a policy provision is in conflict with the applicable law of the State in which this policy is issued, the law of the State will apply.

11. **Premium.** The premium for this policy may vary based upon the purchase of other insurance from one of the State Farm affiliated companies.

12. **Right to Inspect.** We have the right but are not obligated to make inspection and surveys at any time, give you reports on conditions we find and recommend changes. Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged.

We do not:

a. make safety inspections;

b. undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public;

c. warrant that conditions are safe or healthful; or

d. warrant that conditions comply with laws, regulations, codes or standards.

This condition applies not only to us but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

13. **Joint and Individual Interests.** When there are two or more named insureds, each acts for all to cancel or change the policy.

## OPTIONAL POLICY PROVISIONS

Each Optional Policy Provision applies only as shown in the **Declarations** and is subject to all the terms, provisions, exclusions and conditions of this policy.

**Option AI - Additional Insured.** The definition of **insured** is extended to include the person or organization shown in the **Declarations** as an Additional Insured or whose name is on file with us. Coverage is with respect to:

1. Section I - Coverage A; or

2. Section II - Coverages L and M but only with respect to the **residence premises**. This coverage does not apply to **bodily injury** to an employee arising out of or in the course of the employee's employment by the person or organization.

This option applies only with respect to the location shown in the **Declarations**.

**Option BP - Business Property.** The **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**, item b., for property used or intended for use in a **business**, including merchandise held as samples or for sale or for delivery after sale, is changed as follows:

The $1,000 limit is replaced with the amount shown in the **Declarations** for this option.

**Option BU - Business Pursuits. SECTION II - EXCLUSIONS**, item 1.b. is modified as follows:

1. Section II coverage applies to the **business** pursuits of an **insured** who is a:

   a. clerical office employee, salesperson, collector, messenger; or

   b. teacher (except college, university and professional athletic coaches), school principal or school administrator;

   while acting within the scope of the above listed occupations.

2. However, no coverage is provided:

   a. for **bodily injury** or **property damage** arising out of a **business** owned or financially controlled by the **insured** or by a partnership of which the **insured** is a partner or member;

   b. for **bodily injury** or **property damage** arising out of the rendering of or failure to render professional services of any nature (other than teaching or school administration). This exclusion includes but is not limited to:

(1) computer programming, architectural, engineering or industrial design services;

(2) medical, surgical, dental or other services or treatment conducive to the health of persons or animals; and

(3) beauty or barber services or treatment;

c. for **bodily injury** to a fellow employee of the **insured** injured in the course of employment; or

d. when the **insured** is a member of the faculty or teaching staff of a school or college:

(1) for **bodily injury** or **property damage** arising out of the maintenance, use, loading or unloading of:

(a) draft or saddle animals, including vehicles for use with them; or

(b) aircraft, **motor vehicles**, recreational motor vehicles or watercraft, airboats, air cushions or personal watercraft which use a water jet pump powered by an internal combustion engine as the primary source of propulsion;

owned or operated, or hired by or for the **insured** or employer of the **insured** or used by the **insured** for the purpose of instruction in the use thereof; or

(2) under Coverage M for **bodily injury** to a pupil arising out of corporal punishment administered by or at the direction of the **insured.**

**Option FA - Firearms.** Firearms are insured for accidental direct physical loss or damage.

The limits for this option are shown in the **Declarations**. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss.

The following additional provisions apply:

1. we do not insure for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

a. mechanical breakdown, wear and tear, gradual deterioration;

b. insects or vermin;

c. any process of refinishing, renovating, or repairing;

d. dampness of atmosphere or extremes of temperatures;

e. inherent defect or faulty manufacture;

f. rust, fouling or explosion of firearms;

g. breakage, marring, scratching, tearing or denting unless caused by fire, thieves or accidents to conveyances; or

h. infidelity of an **insured's** employees or persons to whom the insured property may be entrusted or rented;

2. our limit for loss by any Coverage B peril except theft is the limit shown in the **Declarations** for Coverage B, plus the aggregate limit;

3. our limits for loss by theft are those shown in the **Declarations** for this option. These limits apply in lieu of the Coverage B theft limit; and

4. our limits for loss by any covered peril except those in items 2. and 3. are those shown in the **Declarations**.

**Option HC - Home Computer.** The **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability,** item j., for electronic data processing system equipment and the recording or storage media used with that equipment is increased to be the amount shown in the **Declarations** for this option.

**Option IO - Incidental Business.** The coverage provided by this option applies only to that incidental **business** occupancy on file with us.

1. **COVERAGE A - DWELLING, Dwelling Extension,** item 2.b. is deleted.

2. **COVERAGE B - PERSONAL PROPERTY** is extended to include equipment, supplies and furnishings usual and incidental to this **business** occupancy. This Optional Policy Provision does not include electronic data processing system equipment or the recording or storage media used with that equipment or merchandise held as samples or for sale or for delivery after sale.

The Option IO limits are shown in the **Declarations**. The first limit applies to property on the **residence premises**. The second limit applies to property while off the **residence premises**. These limits are in addition to the **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability** on property used or intended for use in a **business**.

3. Under Section II, the **residence premises** is not considered **business** property because an **insured** occupies a part of it as an incidental **business**.

4. **SECTION II - EXCLUSIONS**, item 1.b. of Coverage L and Coverage M is replaced with the following:

   b. **bodily injury** or **property damage** arising out of **business** pursuits of an **insured** or the rental or holding for rental of any part of any premises by an **insured**. This exclusion does not apply:

   (1) to activities which are ordinarily incident to non-**business** pursuits or to **business** pursuits of an **insured** which are necessary or incidental to the use of the **residence premises** as an incidental **business**;

   (2) with respect to Coverage L to the occasional or part-time **business** pursuits of an **insured** who is under 19 years of age;

   (3) to the rental or holding for rental of a residence of yours:

      (a) on an occasional basis for exclusive use as a residence;

   (b) in part, unless intended for use as a residence by more than two roomers or boarders; or

   (c) in part, as an incidental **business** or private garage;

   (4) when the dwelling on the **residence premises** is a two family dwelling and you occupy one part and rent or hold for rental the other part; or

   (5) to farm land (without buildings), rented or held for rental to others, but not to exceed a total of 500 acres, regardless of the number of locations.

5. This insurance does not apply to:

   a. **bodily injury** to an employee of an **insured** arising out of the **residence premises** as an incidental **business** other than to a **residence employee** while engaged in the employee's employment by an **insured**;

   b. **bodily injury** to a pupil arising out of corporal punishment administered by or at the direction of the **insured**;

   c. liability arising out of any acts, errors or omissions of an **insured**, or any other person for whose acts an **insured** is liable, resulting from the preparation or approval of data, plans, designs, opinions, reports, programs, specifications, supervisory inspections or engineering services in the conduct of an **insured's** incidental **business** involving data processing, computer consulting or computer programming; or

   d. any claim made or suit brought against any **insured** by:

   (1) any person who is in the care of any **insured** because of child care services provided by or at the direction of:

      (a) any **insured**;

      (b) any employee of any **insured**; or

(c) any other person actually or apparently acting on behalf of any **insured**; or

(2) any person who makes a claim because of **bodily injury** to any person who is in the care of any **insured** because of child care services provided by or at the direction of:

(a) any **insured**;

(b) any employee of any **insured**; or

(c) any other person actually or apparently acting on behalf of any **insured**.

Coverage M does not apply to any person indicated in (1) and (2) above.

This exclusion does not apply to the occasional child care services provided by any **insured**, or to the part-time child care services provided by any **insured** who is under 19 years of age.

**Option JF - Jewelry and Furs**. Jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones, gold other than goldware, silver other than silverware and platinum are insured for accidental direct physical loss or damage.

The limits for this option are shown in the **Declarations**. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss.

The following additional provisions apply:

1. we do not insure for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

   a. mechanical breakdown, wear and tear, gradual deterioration;

   b. insects or vermin;

   c. inherent vice; or

   d. seizure or destruction under quarantine or customs regulations;

2. our limit for loss by any Coverage B peril except theft is the limit shown in the **Declarations** for Coverage B, plus the aggregate limit;

3. our limits for loss by theft are those shown in the **Declarations** for this option. These limits apply in lieu of the Coverage B theft limit; and

4. our limits for loss by any covered peril except those in items 2. and 3. are those shown in the **Declarations** for this option.

**Option SG - Silverware and Goldware Theft**. The **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**, item i., for theft of silverware and goldware is increased to be the amount shown in the **Declarations** for this option.

IN WITNESS WHEREOF, this Company has caused this policy to be signed by its President and Secretary at Bloomington, Illinois.

*Lynne M. Yowell*

Secretary

*Michael T. Tipson*

President

The Board of Directors, in accordance with Article VI(c) of this Company's Articles of Incorporation, may from time to time distribute equitably to the holders of the participating policies issued by said Company such sums out of its earnings as in its judgment are proper.

FE-7528.3
Page 1 of 1

## FE-7528.3 INFLATION AND DWELLING REPLACEMENT COST ENDORSEMENT

**SECTION I - COVERAGES:** The following is added:

### INFLATION COVERAGE

The limits of liability shown in the **Declarations** for Coverages A and B will be increased at the same rate as the increase in the Inflation Coverage Index shown in the **Declarations**.

To find the limits on a given date:

1. divide the Index on that date by the Index as of the effective date of this Inflation Coverage provision; then

2. multiply the resulting factor by the limits of liability for Coverages A and B separately.

The limits of liability will not be reduced to less than the amounts shown in the **Declarations**.

If during the term of this policy the Coverage A limit of liability is changed at your request, the effective date of this Inflation Coverage provision is changed to coincide with the effective date of such change.

**SECTION I – LOSS SETTLEMENT**

**COVERAGE A – DWELLING** is replaced with the following:

### COVERAGE A - DWELLING

1. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **SECTION I - COVERAGES, COVERAGE A - DWELLING,** except for wood fences, subject to the following:

   a. until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the **Declarations**, not to exceed the cost to repair or replace the damaged part of the property;

   b. when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the **Declarations**, whichever is less;

   c. to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed; and

   d. we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure.

2. Wood Fences: We will pay the actual cash value at the time of loss for loss or damage to wood fences, not to exceed the limit of liability shown in the **Declarations** for COVERAGE A - DWELLING EXTENSION.

All other policy provisions apply.

FE-7528.3

**EXHIBIT**

**3**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

MICHAEL MARINO,                    )
                                   )
                 Plaintiff,        )
                                   )
vs.                                )          NO. CIV-22-0885-HE
                                   )
STATE FARM FIRE AND CASUALTY       )
COMPANY, *et al.*,                 )
                                   )
                 Defendants.       )

## ORDER

Plaintiff Michael Marino filed this case in Oklahoma state court, asserting claims against State Farm Fire and Casualty Company ("State Farm"). The claims arise out of State Farm's denial of plaintiffs' hail damage claim under a homeowner's policy issued by State Farm. Plaintiffs assert claims for breach of contract and bad faith breach of contract against State Farm. Plaintiffs also assert claims against defendant Yearout Insurance Agency, Inc. ("Yearout"), a State Farm agent involved in procuring and issuing the policy.

State Farm removed the case to this court on the basis of diversity of citizenship of the parties. The notice of removal acknowledged that both plaintiff and defendant Yearout are citizens of Oklahoma and hence not diverse but argued that Yearout was fraudulently joined as a defendant and that its citizenship should be disregarded. Plaintiffs dispute that Yearout was fraudulently joined and contend that valid claims are stated against it. After plaintiff's motion to remand was fully briefed, the court granted State Farm's motion for jurisdictional discovery. That discovery is now complete and both parties have filed supplemental responses to the motion to remand. For the reasons stated below, the court

EXHIBIT

concludes the motion to remand should be denied and the claims against Yearout dismissed.

"[U]pon allegations of fraudulent joinder designed to prevent removal, federal courts may look beyond the pleadings to determine if the joinder, although fair on its face, is a sham or fraudulent device to prevent removal." Smoot v Chicago, R.I. & P. R.R. Co., 378 F.2d 879, 881-82 (10th Cir. 1967) (citation omitted).  Fraudulent joinder may be established either by showing actual fraud in the pleading of jurisdictional facts or the inability of the plaintiff to establish a cause of action against the non-diverse defendant in state court.  Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013).  There must be a "reasonable basis to believe plaintiff might succeed in at least one claim against the non-diverse defendant."  Nerad v. AstraZeneca Pharms., Inc., 203 Fed. Appx. 911, 913 (10th Cir. 2006).  A court should avoid pre-trying disputed factual issues, but, where an inquiry beyond the pleadings is warranted, "the issue must be capable of summary determination and be proven with complete certainty."  Id. (citation omitted).

As noted, a court ordinarily avoids inquiring into the underlying facts in connection with a motion to remand.  But this is not an ordinary case.  As noted in the court's prior orders (Order, Jan. 26, 2023 [Doc. #37], referencing similar order in Goebel v. State Farm Fire & Cas. Co., CIV-22-0882 [Doc. #37]), the use of substantially identical, cookie-cutter allegations as to the claimed role of local State Farm agents, included in petitions filed in dozens of cases by the same group of lawyers, at the very least raises substantial questions as to whether a good faith basis exists for claims asserted here against the non-diverse agent.  As a result, the court has considered the underlying facts and circumstances as

2

reflected by the parties' post-discovery supplemental submissions. Having done so, the court concludes Yearout is fraudulently joined within the meaning of the removal cases.

As a threshold matter, it is now clear that many of the cookie-cutter allegations offered to state a claim against Yearout are false or at least unsupported.[1] The petition says that Yearout represented that plaintiff's roof was in good condition and eligible for a full replacement cost policy. But Ms. Marino says that in her conversations with Yearout, there were no "discussions about the roof" and that she simply assumed others were doing any necessary check of the roof.[2] (The parties' submissions raise the possibility that Mr. Marino may have had discussions with Yearout personnel, but there are no evidentiary submissions to support that.) The petition more specifically alleges that Yearout represented that plaintiff's roof met all of State Farm's underwriting standards, but Ms. Marino recalls no conversations about underwriting standards.[3]

As in the dozens of other cases, the petition alleges that the local State Farm agent, here Yearout, represented to plaintiffs[4] that obtaining full replacement cost coverage

---

[1] *Plaintiff relies principally on the deposition testimony of Machele Marino, the wife of the named plaintiff, for proof of the dealings with Yearout. Ms. Marino was an insured under the policy, was involved in the various interactions with Yearout, and was apparently the person to whom most of the alleged misrepresentations were made, but is not a named plaintiff in the case due to a "scrivener's error." Mr. Marino, the named plaintiff, has apparently been seriously ill for several years and has apparently not been deposed or otherwise involved in addressing the present motion.*
[2] *Deposition of Machele Marino, Doc. #50-2, page 78 (hereafter "Marino deposition; page numbers are to the numbering in the deposition transcript).*
[3] *Marino deposition, p. 108. The testimony of Janis Yearout is not to the contrary: she answered "yes" when asked "Do you ever share these underwriting guidelines or requirements with the insureds?" but was not asked about the Marino's specifically. Janis Yearout deposition, Doc. #50-1, p. 307.*
[4] *This order sometimes refers to the plaintiffs — plural — though only Mr. Marino is literally a plaintiff at this point.*

"would be no problem whatsoever," but Ms. Marino has no recollection of those words being used.[5]   It is unremarkable that she would not recall that language, given that the policy was originated in 2004, some seventeen years before the storm and hail claim now at issue. But, in any event, there is no evidentiary support for that allegation of the petition.

The petition also says Yearout represented to plaintiffs that she would be getting the "broadest form of coverage available today" but Ms. Marino has no recollection of those words being used and indicated she had no conversations with Yearout as to coverage beyond plaintiffs' request for a full cost replacement policy.[6]   The petition alleges that Yearout represented to plaintiffs that they should insure their home to 100% of replacement cost value as determined by Yearout using State Farm's software, but Ms. Marino does not now recall any conversations with Yearout personnel as to determining coverage amounts.[7] The petition alleges Yearout made representations as to how State Farm would follow Oklahoma law and that it would fully and fairly investigate all claims; there is no evidentiary support from Marino as to that.  Indeed, Ms. Marino's deposition makes it clear that there were minimal discussions of any kind as to the details of the policy being obtained (beyond it being a full cost replacement policy), because this was the third house State Farm had insured for plaintiffs, the in-depth discussions had occurred as to the first house years before, and plaintiffs assumed the agency would understand what they wanted.[8]

---

[5] *Marino deposition, p. 110-11.*
[6] *Marino deposition, p. 109.*
[7] *Marino deposition, p. 124.*
[8] *Marino deposition, p. 107.*

There are, in short, multiple allegations going to the potential liability of Yearout for which there is zero evidence, indicating that those allegations were made without a valid, good faith basis. The court is left with the firm impression that many, and perhaps most, of the most significant factual allegations as to Yearout were included because they met someone's formulaic view of what a court might accept as a basis for claim against Yearout, not because there was a real factual basis for them. Those circumstances support viewing Yearout as fraudulently joined on the basis of the first potential grounds for doing so — actual fraud in the pleading of at least some of the jurisdictional facts.

The alternate basis for concluding fraudulent joinder — the absence of a viable claim against the challenged defendant — also applies here. The claims alleged against Yearout in the petition are for negligent procurement of insurance and constructive fraud/negligent misrepresentation. It is true that Oklahoma recognizes a negligent procurement claim where, by reason of the agent's actions, insurance is not provided as promised and the insured suffers a loss as a result. Swickey v. Silvey Cos., 979 P.2d 266, 268 (Okla.Civ.App. 1999). But here, it is undisputed that the policy the Marinos wanted — one for full cost replacement coverage of their property — was in fact delivered. Plaintiff seeks to avoid the impact of that fact by arguing that the policy delivered was illusory, relying on cases where the policy delivered was so limited by exclusions that plaintiffs did not get the coverage they reasonably expected. See, e.g., Yeary v. Safeco Ins. Co., Case No. 22-CV-0250-CVE-SH, 2022 WL 3447120 (N.D. Okla. Aug. 17, 2022). But that circumstance is not present here. There is nothing in the policy delivered which

implausibly limits its reach.[9]  Rather, plaintiff's complaint is with the way State Farm has underlined applied the policy language, arguing that it unreasonably requires damage to penetrate to the back side of the shingle mat.  But that complaint, if ultimately established, is a basis for claim against State Farm, essentially that it has failed to fairly apply the contract language in the claims administration process.  That is something different from proving that the agent failed to deliver the policy promised.

Plaintiff attempts to make out other negligent procurement and misrepresentation claims they may have against the agent, but they also fall short for one reason or another. Plaintiffs argue Yearout was the "first line of underwriting" for State Farm and therefore had a duty to inspect plaintiffs' property and to advise them of the condition of their house. Further, they contend Yearout had a continuing duty to inspect the property and advise plaintiffs of anything that might impact some future claim.  None of the cases cited by plaintiffs suggest that Oklahoma law imposes, without more, such a duty on the agent.  In particular, plaintiff has not identified any Oklahoma case suggesting that whatever role an agent plays in the underwriting process results in a duty owed to the insured.[10]  Plaintiff's point to various documents obtained in discovery addressing an inspection/underwriting function for State Farm agents, but none of those suggest some duty to the insured.  In other

---

[9] *Marino deposition, p.136.*
[10] *Defendant references multiple cases from other jurisdictions indicating an agent does not have underwriting duties owed to the insured and no Oklahoma case to the contrary has been cited or located by the court.  Ms. Marino herself appeared to understand the distinction, acknowledging that whether Yearout's inspection in 2004 was sufficient (such as whether she took appropriate pictures of the house) was a matter of State Farm's benefit, not hers.  Marino deposition, pp. 80-81.*

words, State Farm may well have multiple requirements as to what it expects its agents to do as part of its underwriting process, but that is not the same thing as concluding there is some underwriting duty <u>owed to the insured</u>.

Plaintiff attempts to invoke the principle that an agent may assume, by its representations or conduct, duties beyond those it would automatically have by reason of the relationship. But plaintiffs' evidence falls short in that regard as well. Ms. Marino repeatedly says that the representations she relied on from the agent over the years were to the effect that the coverage remained in place, and it undisputedly did.[11] As noted above, State Farm's denial of the hail claim, even if proven to be wrong and unreasonable, does not translate into a conclusion that plaintiff's policy did not cover the peril or that the agent's representations in connection with it were wrong.

There do not appear to be any other representations of Yearout which would be a basis for claim here (i.e. representations for which there is actual evidence rather than just a formulaic assertion in the petition). Ms. Marino's deposition testimony makes it explicitly clear that what she viewed as the basis for complaint against Yearout was that Yearout did not act as an advocate for plaintiffs in the claims administration process with State Farm.[12] Plaintiffs have not cited, and the court has not located, any Oklahoma authority which would suggest that an insurance agent, particularly a captive agent like Yearout, had a duty to act as an advocate for the insured against the company. No doubt there are financial and other reasons why it may be in the interest of an agent to "advocate"

---

[11] *Marino deposition, p. 146.*
[12] *Marino deposition, p. 84.*

for the insured on occasion, but that is not the same thing as saying an agent has a legal duty to advocate for the insured in the claims process or that it could be held liable for not advocating vigorously enough.

Plaintiffs also suggest they have claims arising out of Yearout's involvement in selecting the amount of coverage under the policy. It is not altogether clear whether plaintiffs' assertion is that Yearout did a bad job of estimating replacement value and therefore secured a policy with too little or too much coverage or whether the argument is that plaintiffs paid too much in premiums because their claim didn't ultimately get paid. If the argument is some variation of the former, it suffices to say that it is undisputed that the amount of coverage under the policy greatly exceeded the potential cost of totally replacing the roof if total replacement was otherwise justified.[13]   There is therefore no basis for concluding that the denial of plaintiffs' hail claim was due to inadequate coverage obtained by Yearout.

If the objection is to the amount of premiums plaintiffs paid, two things are apparent from the parties' submissions. One is that Mr. and Mrs. Marino were actively involved in setting the amount of their coverage on the house and that they sometimes sought and got increases of coverage beyond what State Farm or its agents recommended.[14]   So if the complaint is that they paid too much as a result of being overinsured, Ms. Marino's testimony is that those amounts were the result of the insistence of the plaintiffs and hence

---

[13] *Marino deposition, pp. 112-113, indicating the cost of a total roof replacement was approximately $30,000 and total coverage on the dwelling was $244,000.*
[14] *Marino deposition, pp. 93, 113-4, and 127.*

8

no basis for claim against Yearout. If, on the other hand, the argument is that they paid too much premium because they did not get what they paid for, that argument is essentially the same one noted above as to whether the policy was illusory. And the argument is unavailing. What plaintiffs paid for was a policy providing coverage based on full replacement value. Full replacement value does not mean that an insured is guaranteed that its claims will always be paid in full. There is therefore no claim available against Yearout based on the determination of policy coverage.

In short, there is no reasonable basis to believe that plaintiff could establish either a negligent procurement claim or a constructive fraud/negligent misrepresentation claim against Yearout in the circumstances existing here.

Accordingly, for the reasons state above, Yearout is a fraudulently joined defendant for removal purposes and its citizenship must be disregarded. Plaintiff's motion to remand [Doc. #18] is therefore **DENIED**. The claims against Yearout Insurance Agency, Inc. are **DISMISSED** without prejudice but without leave to amend.

**IT IS SO ORDERED**.

Dated this 7th day of August, 2023.

JOE HEATON
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHARLES GOEBEL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. CIV-22-0882-HE |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

Plaintiffs Charles and Christina Goebel filed this case in the District Court of Cleveland County, State of Oklahoma, asserting claims against State Farm Fire and Casualty Company ("State Farm"). They assert claims for breach of contract and bad faith breach of contract, arising out of State Farm's denied of a hail damage claim under a homeowner's policy issued by it. Plaintiffs also assert claims against defendant Paul J. Garetson Insurance Agency, LLC ("Garetson"), a State Farm agent involved in procuring and issuing the policy.

State Farm removed the case to this court on the basis of diversity of citizenship of the parties. The notice of removal acknowledged that both plaintiffs and defendant Garetson are citizens of Oklahoma and hence not diverse but argued that Garetson was fraudulently joined as a defendant and that its citizenship should be disregarded. Plaintiffs dispute that Garetson was fraudulently joined and contend that valid claims are stated against it. After plaintiff's motion to remand was fully briefed, the court granted State Farm's motion for jurisdictional discovery. It did so as a result of substantial doubts

**EXHIBIT**
**5**

existing as to the plausibility of the factual allegations against the agent, due to substantially identical allegations having been made in dozens of other cases filed against State Farm by plaintiffs represented by same the same lawyers.   The jurisdictional discovery is now complete and both parties have filed supplemental responses to the motion to remand.   For the reasons stated below, the court concludes the motion to remand should be denied and the claims against Garetson dismissed.

"[U]pon allegations of fraudulent joinder designed to prevent removal, federal courts may look beyond the pleadings to determine if the joinder, although fair on its face, is a sham or fraudulent device to prevent removal." Smoot v Chicago, R.I. & P. R.R. Co., 378 F.2d 879, 881-82 (10th Cir. 1967) (citation omitted).   Fraudulent joinder can be shown either by establishing actual fraud in the pleading of jurisdictional facts or by establishing the plaintiff's inability to make out a cause of action against the non-diverse defendant in state court. Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013).   There must be a "reasonable basis to believe plaintiff might succeed in at least one claim against the non-diverse defendant." Nerad v. AstraZeneca Pharms., Inc., 203 Fed. Appx. 911, 913 (10th Cir. 2006).

Courts generally avoid pre-trying disputed facts in this context but may, as noted above, look beyond the pleadings in a proper case.  In resolving disputed factual issues and reaching related conclusions, however, "the issue must be capable of summary determination and be proven with complete certainty." Id. (citation omitted).

Having considered the parties' supplemental submissions following jurisdictional discovery, the court concludes Garetson should be viewed as a fraudulently joined

defendant on both of the grounds referenced above. It reaches that conclusion fully mindful of the exacting standard required to be established and recognizing the various deferential standards (to the non-removing plaintiffs) which apply.

In evaluating whether there is fraud in the pleading of jurisdictional facts, the court has relied primarily on the deposition testimony of plaintiff Charles Goebel, who was the plaintiff primarily involved in the dealings with Garetson and to whom any representations would have been made.[1] It has done so, however, against the backdrop of substantially identical allegations being implausibly made against State Farm agents in dozens of other cases, including at least two before this court which involved substantially the same issues.[2]

The petition filed by plaintiffs is replete with false statements. Although Mr. Goebel more or less replied, in response to a question from his counsel, that the allegations in the petition were true so far as he knew,[3] his responses to multiple specific questions make it clear they are not and that he had little familiarity with the petition filed on his behalf.

The petition alleges that Garetson[4] represented to Goebels that his roof was in good condition, when in fact Garetson made no representation to him about it. Mr. Goebel knew, as did Garetson, that the house and roof were new in 2011, when the initial policy was

---

[1] *Video Deposition of Charles Goebel, Doc. #57-2, pp. 23 & 82 (the "Goebel deposition" hereafter; page numbers refer to pagination in the deposition.*

[2] See Case No. CIV-22-0882, *Marino v. State Farm* and Case No. CIV-22-928, <u>*Baltasar v. State Farm.*</u>

[3] *Goebel deposition, p. 162-3. The question was not a model of clarity as to what was being asked.*

[4] *As noted above, the defendant in this case, referenced as "Garetson" is the Garetson Agency, not Paul Garetson personally. Although the petition refers to various representations "he" made, it is clear from Mr. Goebel's testimony that none of the claimed statements at issue were made by Mr. Garetson, but were, crediting plaintiffs' account, made by other unidentified persons at the Garetson agency.*

written, and Mr. Goebel simply assumed the roof must be okay if, as Garetson told him, the policy was issued as requested.[5]  The petition alleges that Garetson represented that the house met State Farm's underwriting guidelines, but Mr. Goebel testified there was no discussion of underwriting.[6]  The petition alleges that Garetson represented to plaintiffs that the policy issued was the "best policy State Farm offered" and that it provided the "broadest coverage available."  Mr. Goebel testified that no one said any such thing.[7]

The petition alleges that Garetson represented that the coverage limits in the policy should be set at 100% of replacement cost value "as determined by him" and that the coverage amount represented "100 percent to insurance to value."  Mr. Goebel testified he "had never heard that" and that the only representation made to him was that he would get a full cost replacement policy.[8]

The petition alleges that the amount of coverage recommended by Garetson was determined by using State Farm's valuation software and that Garetson and State Farm "represented to Plaintiffs that State Farm's valuation software was a reliable and accurate tool . . . ."  Mr. Goebel testified there was no discussion about State Farm's valuation tool.[9]

The petition alleges that State Farm and Garetson represented to plaintiffs that they "would conduct themselves in accordance with Oklahoma law and would fully and fairly investigate and pay claims."  Mr. Goebel testified there was no discussion of Oklahoma

---

[5] *Goebel deposition, pp. 56-7.*
[6] *Goebel deposition, pp. 88-9.*
[7] *Goebel deposition, pp. 102-3.*
[8] *Goebel deposition, p. 116-7.*
[9] *Goebel deposition, p. 117-8.*

law and that the only representation as to claims handling by Garetson was "just submit the claim to us and we'll handle the rest."[10]

In short, there are multiple allegations in the petition which are simply false. One or two such instances might be overlooked as the sort of mistake or inconsistency that will often occur at the outset of a case before the factual circumstances are explored and before the details are fully known to counsel. But that explanation does not explain the nature and extent of the false allegations here, particularly when viewed against the backdrop of the same formulaic, cookie-cutter allegations used in this and dozens of other similar cases. The submissions before the court establish that there is no good faith basis for a substantial portion of the facts alleged and which are relied on in an effort to state a claim against the resident defendant. That circumstance constitutes fraud in the pleadings of jurisdictional facts, within the meaning of the authorities addressing removal and remand, and warrants viewing Garetson as a fraudulently joined defendant whose citizenship should be ignored for present purposes.

The same conclusion follows from application of the second possible basis for finding fraudulent joinder — the absence of a viable claim against the resident defendant. The claims alleged in the complaint against Garetson are for negligent procurement and constructive fraud/negligent misrepresentation.

With respect to the negligent procurement claim, it is true that Oklahoma recognizes such a claim where, by reason of the agent's actions, insurance is not provided as promised

---

[10] *Goebel deposition, pp. 117-8.*

and the insured suffers a loss as a result. <u>Swickey v. Silvey Cos.</u>, 979 P.2d 266, 268 (Okla.Civ.App. 1999). But here, it is undisputed that the policy Mr. and Mrs. Goebel wanted — a full cost replacement policy — is exactly what they got. Plaintiffs attempt to avoid the impact of that fact by arguing the policy they got was illusory, but there is no factual basis for such an assertion. The policy is not one where the exclusions and limitations in it are so extensive as to be inconsistent with an insured's reasonable expectations of coverage. *See, e.g.* <u>Yeary v. Safeco Ins. Co.</u>, Case No. 22-CV-0250-CVE-SH, 2022 WL 3447120 (N.D. Okla. Aug. 17, 2022). Rather, plaintiffs' complaint is that State Farm has applied the policy language in an unreasonable way. That contention, if established at trial, may well make out a successful breach of contract or bad faith breach claim, but it does not render the contract illusory or otherwise state a basis for claim against the agent who procured it. An agent does not deliver an "illusory" policy just because, ten-plus years later, a claim is denied on disputed grounds.

Plaintiffs' attempts to make out negligence or other claims against Garetson also fall short. Plaintiffs contend, as to their purported negligence and constructive fraud claims, that Garetson owed them a duty to advise them about the condition of their roof over the years and point to State Farm documentation indicating that agents were the "first line of underwriting" and had obligations to physically inspect and reinspect properties. But neither the State Farm documentation nor the cases cited by plaintiffs support the notion that Oklahoma law imposes any such a duty on an agent. Whatever underwriting duties Garetson may have owed to State Farm, as agent to principal, do not necessarily translate into a duty <u>to the insured</u>. In short, there is no basis shown here for a duty to

plaintiffs, grounded in Garetson's "underwriting" function, that could plausibly be a basis for a negligence or other claim based on some legal duty to plaintiffs.

It is true, as plaintiffs argue, that an agent may by its representations or conduct, assume duties beyond those inherently tied to its role as agent. But here, plaintiffs' evidence goes no further than to support an inference that Garetson represented it would continue to be involved as necessary to assure plaintiffs had a full replacement cost policy in place. And is undisputed that they did — plaintiffs were covered by a State Farm replacement cost policy from 2011, when the house was first insured, through the period in 2021 when the insurance claim was submitted.

Bottom line, there is no basis shown for concluding that Garetson undertook or otherwise had a duty beyond securing the issuance of the initial and renewal policies for full replacement coverage. Plaintiffs' arguments essentially contend that an agent has a duty to anticipate, and advise the insured as to, anything that might conceivably limit the payment of a future claim. Such a contention goes beyond any duty contemplated by Oklahoma law.

Plaintiffs also contend that Garetson did not properly value their house when State Farm issued their replacement cost policy. But it is undisputed that the amount of coverage obtained — $225,000 initially with increases in later years — substantially exceeded the amount necessary to pay for a full replacement of plaintiffs' roof (approximately $26,000). So, any issue as to coverage amounts did not lead to any of the damages that plaintiffs assert via their claim for damage to the roof. To the extent that plaintiffs' contention as to valuation is intertwined with the argument that they did not get what he paid for, the answer

is as noted above.  That an insurance company eventually denies a claim under a policy does not, without more than appears here, translate into a conclusion that the policy was illusory or that the agent breached some duty by delivering it.

In sum, there is no reasonable basis in these facts to believe that plaintiff could establish either a negligent procurement claim or a constructive fraud/negligent misrepresentation claim against Garetson under the circumstances existing here.

Accordingly, for the reasons stated above, the court concludes Garetson is a fraudulently joined defendant for removal purposes and its citizenship must be disregarded. Plaintiffs' motion to remand [Doc. #17] is therefore **DENIED**.  The claims against the Paul J. Garetson Insurance Agency LLC are **DISMISSED** without prejudice but without leave to amend.

**IT IS SO ORDERED.**

Dated this 7th day of August, 2023.

JOE HEATON
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

EDITA BALTASAR,                    )
                                   )
              Plaintiff,      )
                                   )
vs.                                )        NO. CIV-22-0928-HE
                                   )
STATE FARM FIRE AND CASUALTY       )
COMPANY, *et al.*,                 )
                                   )
              Defendants.     )

### ORDER

Plaintiff Edita Baltasar filed this case in Oklahoma state court, asserting claims against State Farm Fire and Casualty Company ("State Farm") and one of its agents, Cal Kiburz Agency Inc. ("Kiburz"). The claims arise out of State Farm's denial of plaintiff's hail damage claims under two insurance policies issued by State Farm.

State Farm removed the case to this court on the basis of diversity of citizenship of the parties. The notice of removal acknowledged that both plaintiff and defendant Kiburz are citizens of Oklahoma and hence not diverse. However, defendant contended in the notice that Kiburz was fraudulently joined as a defendant and that its citizenship should be disregarded. Plaintiff disputes that Kiburz was fraudulently joined and has moved to remand the case to state court.

The citizenship of a fraudulently joined defendant is ignored in determining whether diversity exists. Smoot v. Chicago, Rock Island and Pac. R.R. Co., 378 F.2d 879, 882 (10th Cir. 1967). In order to establish fraudulent joinder in these circumstances, the removing party must demonstrate either (1) actual fraud in the pleading of jurisdictional

**EXHIBIT**

facts or (2) the inability of the plaintiff to establish a cause of action against the non-diverse party in state court. Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013). The burden of showing fraudulent joinder is on the party asserting it and it is a "heavy burden." *Id.* Generally, the court only evaluates removability based on the original pleadings. Dodd v. Fawcett Publ'ns, Inc., 329 F.2d 82, 85 (10th Cir. 1964). "But upon specific allegations of fraudulent joinder the court may pierce the pleadings, consider the entire record, and determine the basis of joinder by any means possible." *Id.* (quotations and citation omitted).

Here, having pierced the pleadings and considered the various submissions of the parties, the court concludes that Kiburz should be deemed a fraudulently joined defendant. That conclusion follows from the extensive false allegations made and relied on, at least initially, by plaintiff as a basis for claim against Kiburz.

The list of factual allegations now known to be false is lengthy. According to the petition filed in state court, plaintiff was suing on polices that covered two of her "homes." It is now clear (and acknowledged by plaintiff) that State Farm had issued policies on eleven structures, not two, and that those structures were rental units, not Ms. Baltasar's "homes" or "residences." According to the petition, Ms. Baltasar contacted Kiburz and requested a replacement policy that covered her homes. It is now undisputed that Ms. Baltasar's policies with State Farm had been in force for many years prior to their eventual reassignment to Kiburz and that they were renters policies, not homeowners policies. According to the petition, Kiburz assured plaintiff that obtaining coverage for her homes would be no problem and made a number of other representations to her about replacement

2

cost coverage, all substantially identical to representations allegedly made by dozens of State Farm agents in dozens of other cases filed by the same plaintiffs' counsel, including one that the agent independently established the replacement cost policy limits for the homes. Perhaps most remarkably, the petition alleged that, consistent with all those alleged statements by its agent about replacement coverage, State Farm in fact "issued a homeowner's full replacement cost insurance policy on each property . . . ." The petition then proceeds to allege identical facts like those alleged in other suits to the effect that the coverage was illusory. It is now undisputed that State Farm did not in fact issue a homeowner's policy to plaintiff and that, at least as to the roof, it did not provide full cost replacement coverage. In short, virtually none of the factual allegations upon which plaintiff relied to state a purported claim against Kiburz have proven to be true.

Faced with those circumstances, plaintiff argues in its motion that at least some of this was just a "scrivener's error", that there is nothing wrong with using forms, and that State Farm's motion does not give her the benefit of the presumption of accuracy as to the alleged facts that she thinks she is entitled to. She then proceeds to construct a new theory of liability as to Kiburz using the new "facts" she now claims or concedes to be true.

The court declines to play plaintiff's — more accurately plaintiff's counsels' — game. To suggest that factual discrepancies like those described above are "scrivener's errors" is ridiculous on its face. Similarly, suggesting that reliance on forms is okay misses the mark. The use of forms is obviously fine if there is a basis in fact and law for the particular form, but a lawyer's use of forms from other cases does not relieve him or her of the duty to assure that, after reasonable inquiry, factual contentions have evidentiary

3

support. Fed.R.Civ.Pro. 11(b). Plainly, many of the central allegations here as to Kiburz not only lack evidentiary support — they are simply false. No presumption against removal jurisdiction can or should insulate a plaintiff from misrepresentations like those involved here, and the court declines to allow plaintiff to now attempt to create some new set of theories based on different facts from those initially alleged.[1]

The court concludes the above circumstances establish, for purposes of the fraudulent joinder standard referenced above, actual fraud in the pleading of jurisdictional facts or at least factual allegations so egregiously and recklessly false as to be tantamount to actual fraud.

In other circumstances, the court might pursue sanctions against plaintiff's counsel based on the false representations involved. However, the false or misleading allegations at issue here were made in a state court filing, which impacts the propriety of sanctions being imposed by a federal court. *See* <u>Griffen v. City of Oklahoma City</u>, 3 F.3d 336, 339 (10th Cir. 1993). As a result, the court merely cautions plaintiff's counsel that the filing of a pleading in this court containing false and/or inaccurate statements like those discussed above is likely to result in significant sanctions. Fed.R.Civ.Pro. 11.

Plaintiff's motion to remand [Doc. #12] is **DENIED**. The purported claims against defendant Cal Kiburz Insurance Agency, Inc. are **DISMISSED** without prejudice but without leave to amend.

---

[1] *Even relying on the "new" facts and theories plaintiff advances, a basis for plausible claim against Kiburz appears unlikely.*

4

**IT IS SO ORDERED**.

Dated this 8th day of August, 2023.

JOE HEATON
UNITED STATES DISTRICT JUDGE